UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GURPAL SINGH, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 06-574 (RMC) |
| ) | |
| SOUTH ASIAN SOCIETY OF THE ) | |
| GEORGE WASHINGTON ) | |
| UNIVERSITY., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant The George Washington University's Motion to Compel Enforcement of a Subpoena Duces Tecum Served on the United States Department of Homeland Security ("DHS"). DHS has refused to produce documents requested in the subpoena on the grounds that they are protected from disclosure by the law enforcement privilege. For the following reasons, the Court will grant the University's motion in part and deny it part, and will order DHS to submit certain documents to the Court for *in camera* review.

### I.  BACKGROUND

The facts underlying this lawsuit have been detailed in several previous opinions, and the Court assumes familiarity with them. On September 21, 2006, the University served a subpoena on DHS requesting ten separate categories of documents relating to security at the Old Post Office Pavilion on the night that Plaintiffs' decedent, Ranjit Singh, was murdered. Mem. of P. & A. In Support of the University's Motion to Compel ("University Mem."), Ex. 1. In accordance with DHS regulations set forth at 6 C.F.R. §§ 5.41 and 5.42, the University also submitted a comprehensive

declaration with exhibits supporting the subpoena and setting forth the need for the documents sought. *Id.*, Ex. 2. The subpoena required DHS to produce the requested information no later than October 21, 2006. *Id.*, Ex. 1.

The University's subpoena sought the following documents:

1. A list of all federal security guards and agents who engaged in any type of security function at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

2. All documents showing, depicting, listing, or explaining all security measures that the Department of Homeland Security had in place for the protection of the Old Post Office Pavilion and its invitees on March 26, 2005 and March 27, 2005, including but not limited to any written security plan or assessment which may have been in place.

3. All DHS and Federal Protective Services incident reports and investigatory files relative to the events at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

4. The personnel files for all federal security guards and agents who performed work at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

5. All documents showing the training, background, and/or experience of all federal security guards and agents who performed work at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

6. All documents showing the duties and responsibilities of all federal security guards and agents who performed work at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005, including documents showing where these individuals were deployed on these dates.

7. All site plans, premises plans, and drawings depicting the exact area at the Old Post Office Pavilion (including entrances and exits, if any) that DHS security guards (or agents thereof) were responsible for at the Bhangra Blowout After-Hours Celebration hosted at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

8. Any agreements, authorizations, and other documents authorizing SecTek, Inc., or any other entity to provide security at the Bhangra Blowout After-Hours Celebration hosted at the Old Post Office Pavilion on March 26, 2005 and March 27, 2005.

9. Any and all non-privileged incident reports, correspondence, memorandum, emails, and other documents regarding the events of March 26, 2005 and March 27, 2005.

      10. Any and all non-privileged incident reports, correspondence, memorandum, emails, and other documents regarding any violence or crime at the Old Post Office Pavilion or within two blocks of the Old Post Office Pavilion in the last five years.

      On or about October 20, 2006, DHS responded to the subpoena with a letter indicating that it would not produce documents responsive to Categories 1-7 of the subpoena on the basis of the law enforcement privilege, and that it would attempt to locate documents responsive to Categories 8-10. University Mem. Ex. 3. It is now clear that DHS is refusing to produce any documents responsive to Categories 1-7 and 9, although it will provide some documents responsive to Categories 8 and 10, with redactions. *Id.*; *see* DHS Resp. to Mot. to Compel Enforcement of Subpoena ("DHS Resp."). The University filed the instant motion on December 19, 2006.

## II. ANALYSIS

      In support of its motion to compel compliance with the subpoena, the University argues that DHS waived its privilege claim by failing to assert it within 14 days of receiving the subpoena as required by Federal Rule of Civil Procedure 45(c)(2)(B), that the law enforcement privilege does not apply, and that even assuming the privilege applies, the relevant factors weigh in favor of disclosure.[1] DHS argues that the law enforcement privilege protects most, if not all, responsive documents from disclosure and that the subpoena is premature because the United States is now a party to this lawsuit and has not yet filed an answer.

    A.    **Waiver.**

      There is no dispute that DHS first raised the law enforcement privilege in response to the University's subpoena 30 days after the subpoena was served, long past the 14-day deadline

---

[1] DHS's October 20, 2006 letter constitutes final agency action, and the Court therefore has jurisdiction to consider the University's motion to compel. *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006).

prescribed by Rule 45(c)(2)(B).  *See* DHS Resp. at 3-4.  DHS offers no reason for its failure to raise the privilege claim in a timely manner but argues that the Court should excuse its untimeliness and consider the privilege claim on the merits because DHS is a nonparty acting in good faith.  *See id.* at 4.  The University responds that no "unusual circumstances" exist that would excuse DHS's failure to raise the privilege within 14 days.  University's Reply at 3.

Although Rule 45(c)(2)(B)'s 14-day requirement applies to the United States and other government agencies that are properly served with a nonparty subpoena, see *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006), the D.C. Circuit has indicated that, when an assertion of the law enforcement privilege is well-taken, the government's failure to comply with the procedural requirements of the Federal Rules will not result in a waiver, see *In re Sealed Case*, 856 F.2d 268, 272 n.3 (D.C. Cir. 1988).  Given the importance of the values that the privilege is designed to protect (*i.e.*, the effective functioning of law enforcement investigations), that DHS's assertion of the privilege is colorable, and that DHS is a nonparty acting in good faith, the Court declines to find a waiver on the facts presented here.  *See id.*; *see also Yousuf*, 451 F.3d at 252.

### B.   Timeliness of Subpoena.

DHS argues that it is premature for the University to be seeking discovery because the United States is now a party to the action and has not yet filed an answer.  DHS Resp. at 10.  But the United States was not a party when the University served a subpoena or when DHS responded to the subpoena.  The fact that Plaintiffs subsequently amended their complaint to add the United States as a defendant has no bearing on the validity of the subpoena that the University properly served on then-nonparty DHS in September 2006.  DHS has cited no authority to the contrary.  Moreover, this case is now over a year old, and the events that lie at the heart of this lawsuit occurred

over two years ago. There is simply no merit to DHS's claim that discovery at this time is "premature."

      C.    **Law Enforcement Privilege.**

Turning to the merits of DHS's privilege claim, the parties agree that three requirements must be met in order to establish the law enforcement privilege: "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *Sealed Case*, 856 F.2d at 271. "The purpose of privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Department of Investigation of the City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (citation omitted).

In assessing whether the proponent of the privilege has demonstrated the final requirement — *i.e.*, that the information properly falls within the scope of the privilege — courts must "weigh the public interest in nondisclosure against the [requesting party's] need for access to the privileged information." *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (internal quotation marks and modifications omitted).

> To achieve this end, a number of factors must be considered, including: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which

> governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case.

*Id.*

In support of its privilege claim, DHS submits the Declaration of John Clark. The University does not challenge Mr. Clark's assertion that he is the head of the department having control over the requested information and, based on his actual personal consideration, that he is formally claiming the privilege. Clark Decl. ¶ 3; University's Reply at 7-8. Predictably, it is the final element — whether the information falls within the scope of the privilege — that the parties dispute. DHS makes three basic arguments why the documents requested in the subpoena fall within the privilege. First, it argues that Categories 1, 4, 5, and (to some extent) 10 would require the disclosure of the names of security personnel, which "would expose them to significant risks of inappropriate contact from, and threats or attempts to influence by, suspects and potential violators of the law, or others who may be attempting to circumvent the law." Clark Decl. ¶¶ 4, 8, 11. Second, Categories 2, 6, 7, and 8 ask DHS to reveal specific security practices at the Old Post Office Pavilion, which would require disclosure of the "vulnerabilities, threats and threat identification, and existing and recommended countermeasures relating to security at the Old Post Office Pavilion" and could, as a result, allow criminals "to circumvent the security measures employed at" that facility.

*Id.* ¶¶ 5, 9.  Third, Categories 3 and 9 ask for DHS's incident reports and investigative files relating to Ranjit Singh's death, which contain information collected by law enforcement officials as part of a homicide investigation that, according to the Metropolitan Police Department, is ongoing.  *Id.* ¶¶ 6, 10.

The Court rejects DHS's first argument.  DHS contends that if the names of contract security guards who work at the Old Post Office Pavilion are disclosed, unknown persons who are bent on violating the law will attempt to contact them.  Although protection of law enforcement personnel is one of the privilege's purposes, see *City of New York*, 856 F.2d at 484, there is no indication that contract security guards at the Old Post Office Pavilion operate in an undercover capacity or have any particular reason to keep their identities a secret.  DHS's contention that some harm will come from releasing the names of the contract security guards who worked on the night of the 2005 Bhangra Blowout is pure speculation.  And DHS cites no authority that supports a claim that the identities of contract security guards at federally owned facilities are categorically immune from disclosure.  Far from presenting some "significant" risk as DHS contends, the Court finds that any risk that these security personnel would be contacted by potential criminals is negligible and is far outweighed by the University's need for the information in this litigation.  Accordingly, DHS will be ordered to produce documents responsive to Categories 1, 4, and 5 and unredacted documents responsive to Category 10.

DHS's second argument — that disclosing security plans in a public manner might compromise DHS's ability to keep the Old Post Office Pavilion secure — is well taken.  There would be obvious risks to public safety if the United States were required to disclose its security designs for one of its buildings.  Thus, *Tuite* factors three and four weigh in favor of nondisclosure.

On the other hand, the University's discovery requests are narrowly tailored to apply only to the night of the murder — that is, the University asks for documentation of the specific security plan employed at the 2005 Bhangra Blowout after-party. Since the Blowout occurred two years ago, and since a murder occurred at or near the event, it may well be that the plan used that night is no longer in effect, in which case there would be less concern about producing the documents that the University seeks. Based on the current record, the Court has insufficient information to balance in a meaningful way the public interest in nondisclosure against the University's need for the information. Accordingly, the Court will order DHS to provide for *in camera* inspection documents responsive to Categories 2, 6, 7, and 8.

Finally, the Court agrees with DHS that any investigation files relating to Ranjit Singh's murder are protected from disclosure by the law enforcement privilege. As discussed in the Court's Order granting in part the MPD's motion to quash (Docket No. 68 — April 30, 2007 Memorandum Opinion & Order), there is an ongoing homicide investigation and premature disclosure of non-public information in law enforcement investigatory files could jeopardize the potential apprehension and prosecution of the suspect. Thus, for the reasons explained in the Court's April 30 Order, the University's motion will be denied with respect to Categories 3 and 9.

### III. CONCLUSION

For the foregoing reasons, the University's motion [Dkt. No. 40] will be granted in part and denied in part. In addition, DHS will be ordered to provide certain documents to the Court for *in camera* review. A memorializing order accompanies this Memorandum Opinion.

Date: May 24, 2007                                  /s/
                                                                 ROSEMARY M. COLLYER
                                                                 United States District Judge