### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GURPAL SINGH, as Administrator** | : | |
| **of decedent RANJIT SINGH,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action No. 06-0574** |
| **v.** | : | **RMC** |
| | : | |
| | : | |
| **SOUTH ASIAN SOCIETY OF THE GEORGE** | : | |
| **WASHINGTON UNIVERSITY,** | : | |
| **Et Al.,** | : | |
| **Defendants.** | : | |

## PLAINTIFFS' OPPOSITION TO THE UNITED STATES' RENEWED MOTION TO DISMISS

Plaintiff opposes the United States' renewed motion to dismiss and respectfully invites the court to consider the following:

### Defendant's motion must be treated as a motion for summary judgment

The United States styles its motion as a motion to dismiss. However, it has attached a number of exhibits to its original motion. Under Fed Rule Civ Proc R 12(b)(6), if on a motion for failure to state a claim upon which relief can be granted, matters outside the pleading are presented, the motion must be treated as one for summary judgment and disposed of as provided in Rule 56. Hence, this motion must be treated as a summary judgment motion.

**Plaintiff's Statement Of Material Facts, Not In Dispute**

1. The "Bhangra Blowout" afterparty was held on March 26-27, 2005 at the Old Post Office Pavilion.  It was attended by approximately 1,200 people.  Alcohol was served between the hours of 9.00 p.m and 2.00 a.m.  General Services Administration had rented part of the Old Post Office Pavilion to George Washington University for the event.    Exhibit E;  Exhibit F;  Exhibit G

2.  The event was promoted by George Washington University and its South Asian Society.  Hill Partners Inc was the property management company for the Old Post Office Pavilion.  It had been hired by the United States.   SecTek Inc. is a company which provides security services at the building.  It was hired by the United States to provide security at the building for the event.  Exhibit H; Exhibit F.

3. The event was attended by Ranjit Singh and a number of his friends. At the end of the event, they used an exit which leads out onto a pedestrian plaza on the 11th St. side of the building.    Exhibit A;  Exhibit B; Exhibit I.

4.  Ranjit Singh was accosted by an individual on the steps shown in Exhibit C.  These steps are a few feet from the exit.  The assailant had attended the event and had accosted Ranjit Singh's friends earlier in the same location. Exhibit C ; Exhibit I.
.

5.  Ranjit  Singh continued to walk towards Pennsylvania Ave. N.W. and was fatally stabbed by the assailant on the corner of the pedestrian plaza and

Pennsylvania Ave.   Exhibit D shows Harkanwal Sandhu standing in the approximate area where the stabbing took place.  Exhibit I.

6. The sidewalk on Pennsylvania Ave. N.W., outside the Old Post Office Pavilion is and was owned by the United States.  The pedestrian plaza area is also owned by the United States, and was also owned by it on the date of the incident. Exhibit J; Exhibit K; Exhibit U.

7.   Federal Protective Services (FPS) is a federal agency which provides security for Federal properties.  Until 2003, it was part of the General Services Administration (GSA), at which time it was transferred to the Department of Homeland Security (DHS).  Exhibit L

8.   The security plan for the "Bhangra Blowout" Afterparty  event on March 26-27, 2005 was submitted to the United States  by Rodney Dyer of Hill Partners, Inc.  The United States approved the plan and its funding.  Exhibit M;   Exhibit N.

9. The United States required that  three armed guards be provided at each public access entrance to the Old Post Office Pavilion.  Exhibit O.

10. There had been multiple, serious, assaults which had occurred at the same event, the year before, as the event ended.  Exhibit P.  Exhibit P came from materials supplied by the United States, Department of Homeland Security. Exhibit Q.

11.  With regard to security inside the building, the United States exercised the power to hire, fire and direct security operations at the building.   Exhibit R. Vicki Willmann, an official from GSA exercised supervision over the building at the time of the event.   She exercised detailed supervision over entrances to the building.  Exhibit V;  Exhibit W; Exhibit X; Exhibit Y.

12.  Post Orders produced by the United States show a detailed level of control over specific entrances and other locations within the Old Post Office Pavilion.  In particular, specific requirements are set forth for the 11th St. Plaza exit.  Exhibit Z.

13.  These requirements included requirements as to checking uniforms, inspecting guards, verifying the presence of Post Orders, making sure report forms are available, examining duty books,  reporting requirements, signing in, picking up equipment, reviewing orders, conducting inspections, checking licences, checking equipment inventory,  and meeting with "occupant agency security officers"  There are directives for not leaving duty posts until relieved, insuring that all incidents are reported  to  FPS.  The Post Orders set forth admittance procedures and requirements for persons wishing to enter the building.  There are procedures for moving property in and out of the building, key control.  Each entrance is designated at to whether armed guards are required. Duty hours are set forth.   X-Ray procedures are established.  Walk through metal detector, visitor pass

procedures, and hazardous materials reporting, procedures are all established.

There is even an established procedure for dealing with lost property.  Exhibit Z.

14.  At 2005 "Bhangra Blowout" Afterparty, there was no provision for security at the exit that  opened onto the plaza area on the 11th St. side of the building, which was used by Ranjit Singh and others at the end of the event.  The only provision for security mentioned in the security plan was for the entrance at Pennsylvania Ave. N.W. and  for the 12th St/South Plaza entrance. Exhibit M.

15.  With regard to the security plan, for the event, the "roaming security" element mentioned refers to security guards inside the building, not outside. Exhibit S.

16.  There were no security guards patrolling or posted in the 11th  St. Pedestrian Plaza or on Pennsylvania Ave. N.W., outside the Old Post Office Pavilion while the "Bhangra Blowout" Afterparty  took place or as it was closing.  Exhibit AA; Exhibit T; Exhibit I; Exhibit M.

## Argument

### The Independent Contractor Defence May Not Be Relied On By The United States

Whether an entity is a federal employee or an independent contractor is a question of federal law. *Leone v. United States*, 910 F.2d 46,  49 (2d Cir. 1990), cert.

denied, 499 U.S. 905, 113 L. Ed. 2d 213, 111 S. Ct. 1103 (1991). In evaluating the

nature of the relationship between the Government and the entity, the Court

focuses on the terms of the contract and the course of dealing between them.

*Williams v. United States*, 50 F.3d at 305. Specifically, there are two primary factors

that distinguish an agent from an independent contractor: (1) the "power of the

Federal Government 'to control the detailed physical performance of the

contractor,'" *United States v. Orleans,* 425 U.S. 807, 814, 96 S. Ct. 1971, 48 L. Ed. 2d

390 (1976) (quoting *Logue v. United States,* 412 U.S. 521, 528, 37 L. Ed. 2d 121, 93

S. Ct. 2215 (1973)); and (2) whether the Government supervises the day-to-day

operations of the contractor, *B&A Marine Co., Inc. v. American Foreign Shipping*

*Co.,* 23 F.3d 709, 713 (2d Cir.), cert. denied, 513 U.S. 961, 130 L. Ed. 2d 336, 115 S.

Ct. 421 (1994).

        The critical factor in distinguishing an employee of the government from an

independent contractor is whether the government retained the authority to control

the detailed physical performance of the work or whether the worker's day-to-day

operations in fact were supervised by the federal government. *Logue,* 412 U.S. at

527-28, 93 S. Ct. at 2219; *Orleans,* 425 U.S. at 814-15, 96 S. Ct. at 1976; *B & A*

*Marine Co., Inc. v. American Foreign Shipping Co., Inc.,* 23 F.3d 709, 713 (2d Cir.),

cert. denied,   U.S. , 115 S. Ct. 521 (1994). *Henry v. United States*, 346 F. Supp. 2d

496 (S.D.N.Y. 2004).  The latter factor is a question of fact, which depends on the

actual level of supervision that the contracting party exercised.

        In this case, it is absolutely clear that the United States failed to hire any

security services from SecTek Inc or any other security company, to provide service

on its land outside the Old Post Office Pavilion, after the event.  There is no

evidence from eyewitnesses, that any security guards were seen in these areas, as the After Party to the Bhangra Blowout closed down.  SecTek has stated that it was not hired for security outside the Old Post Office Pavilion.  Kevin Dyer has testified that the security plan only included areas inside the Old Post Office Pavilion.  Paul Constable, an official with FPS testified that he found no evidence of any steps taken by his agency in connection with the event at all.  To the extent that plaintiff is relying on a failure to provide security in these areas, it is clear, that the U.S. may not rely on the independent contractor defence because no independent contractor  was in fact hired to provide services in these areas.

With respect to plaintiff's assertions with respect to the failure to provide security at the exit used by Ranjit Singh and others, while it does appear to that SecTek was hired to provide such security inside the Old Post Office Pavilion for this event, it also appears that there was no provision for security at the exit that was actually used by Ranjit Singh and others, as the event ended. Mr. Dyer's security plan mentions security posts for the exits/entrances on Pennsylvania Ave. N.W. and 12th St./South Plaza.  Neither of these were the exit used by Ranjit Singh. He and others, exited through open doorways leading onto the plaza area on the 11th St. side of the building.  Hence, there appears to have been no security deployment at the exit that was actually used by Ranjit Singh and many others, as the event closed down.   GSA officials have offices in the Old Post Office Pavilion. GSA officials regularly inspected the building according to Mr. Dyer, and were very familiar with its layout.  E-mails from Ms Willman to Mr. Dyer also show a high degree of familiarity with the exits at the building, including the 11th St. Plaza exit which is specifically mentioned in Exhibit  Y.  The United States cannot claim the

"independent contractor" defence when it approved a plan which failed to provide any security,  at what, it knew, was a working exit to the building.

The security plan formulated by Mr. Dyer was submitted to GSA for its approval.  Mr. Dyer also testified that the United States exercised the power to "hire, fire and direct security operations at the building."  This type of detailed supervision of the physical performance of the work  is in any event, inconsistent with independent contractor status.  With regard to this event the security plan was a detailed plan, for a specific event which was reviewed and specifically approved by GSA.  This took place in the context of extremely detailed control over virtually every aspect of security operations at the building as is shown by the Post Orders produced by the United States in discovery.   Also, various E-mails from Vicki Willmann, show a high degree of control over specific entrances to the building and even the hours that they will be open.  All of this amounts to very detailed supervision over the physical performance of the work.  They also show a day to day level of supervision which is inconsistent with independent contractor status.

**The United States Violated Mandatory Policies to Provide Protection to Persons on Its Property**

The discretionary function defence only covers "acts that 'involve an element of judgment or choice'", *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 1273, 113 L. Ed. 2d 335 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958, 100 L. Ed. 2d 531 (1988)). Therefore, the first step in

determining the applicability of the exception is to consider whether the challenged act or omission violated a mandatory regulation or policy that allowed no other option. Gaubert, 499 U.S. at 322, 111 S. Ct. at 1273-74 (1991). If there is room for judgment, the Court then must determine whether the decision involved the kind of judgment Congress intended to protect. The key inquiry is whether the decisions, be they initial decisions or implementation decisions, are necessarily susceptible to policy analysis. Gaubert, 49.

In this case, plaintiff submits there is a mandatory policy which applies. 40 USC 1315 (a) (a) provides: "To the extent provided for by transfers made pursuant to the Homeland Security Act of 2002, the Secretary of Homeland Security (in this section referred to as the "Secretary") **shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government** (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) **and the persons on the property**. " Emphasis and underlining added. It specifically says DHS "shall" protect persons on property owned by the United States. The use of the term "shall" has universally been interpreted to impose a mandatory requirement. *Association of Civil Technicians v. FLRA,* 306 U.S. App. D.C. 68, 22 F.3d 1150, 1153 (CADC 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive"); Black's Law Dictionary 1375 (6th ed. 1990)."As used in statutes . . . this word is generally imperative or mandatory").

The Old Post Office Pavilion was "owned, occupied and secured by the Federal Government at the time of the incident. It is also clear that it owned the land on the 11th St. Pedestrian Plaza area onto which Ranjit Singh entered after he

left the building. It was here that the conflict began.  The actual fatal stabbing of

Ranjit Singh occurred at the corner of Pennsylvania Ave.  N.W. and the Pedestrian

Plaza.   Pennsylvania Ave. N.W. was and is owned and, regulated by the United

States.   As the owner of all the land immediately outside the Old Post Office

Pavilion,  the United States was under a mandatory duty to protect Ranjit Singh

and others as they were leaving the event.

After the available evidence suggests that there was no security in any of the

critical areas at the time Ranjit Singh was murdered.  An eyewitness has sworn

that he saw no security guards outside the building while the incident occurred.

SecTek will swear that it was not hired to provide any security outside the building.

The security plan for the event prepared by Rodney Dyer and approved by GSA,

provides for no external security.   Paul Constable testified that Federal Protective

Services (FPS), the agency primarily responsible for providing security at the

location, had no record of doing anything to provide security at the event, inside or

outside.  The overwhelming inference must be that there was no security in the

Pedestrian Plaza area on the 11th St. side of the building or on Pennsylvania Ave.

N.W. outside the Old Post Office.

However, it is clear that the United States, through GSA,  knew about the

event.  GSA approved the security plan.  GSA also received a building rental

application from the George Washington University  South Asian Society in which

the event is described in detail, including that the number of attendees was

anticipated to be a 1000 and that alcohol would be served until 1.30 a.m. GSA

rented the space where the event occurred to the George Washington University.

Moreover, the United States had rented the Old Post Office Pavilion out for this event in prior years, so it was very well acquainted with the nature of the event.

The United States also was aware of problems which had occurred at the event the previous year.   A report was turned over to George Washington University pursuant to a subpoena served by it on the Department of Homeland Security and is Exhibit P.   Copies were then provided to plaintiff by George Washington University.  The report is dated April 11, 2004 and clearly relates to the 2004 "afterparty" at the Old Post Office Pavilion.  At 2.44 hours, the author saw an individual come out of the building "covered in blood."  Further investigation revealed another person lying on the floor inside the building, bleeding from the head and ears with lacerations to the right side of his face.   As this victim was observed, "multiple fights and altercations broke out as the event was ordered to be shut down."  An emergency call was made and assistance from the Uniformed Secret Service, U.S. Park Police and the Metropolitan Police as well as FPS units cleared the building.  The report is redacted so it is unclear who its author is.  However, it clearly came from the Department of Homeland Security.

Hence, to summarize, the United States,  knew the event was taking place on March 26-27 2005, knew that it would be attended by at least a 1000 people, knew that alcohol would be served at the event,  knew that the event  would go on until the early morning hours, and knew about  serious problems, at the event,  the previous year.   Given this knowledge, it nevertheless  provided absolutely no security on its land immediately outside the building for the 2005 event,  as the event closed, despite USC 1315(a) (a)'s mandate to protect persons on federal property.  Indeed, Federal Protective Services (FPS), the agency,  within the

Department of Homeland Security (DHS) which was responsible for providing security at the building, apparently did nothing.  [1]Whereas, the precise manner in which  security to be provided may be covered  by  the discretionary function defense, there surely, can be no discretion to completely ignore a federal statute which lays down a  mandatory requirement to provide some security.

In *Fanoele v. United States,* 975 F. Supp. 1394 (D. Kan. 1997), a case relied on by the United States, the court applied  the discretionary function exception to the manner in which Marshals Service secured  a federal courthouse.  There, the court held that, the Facilities Standards was not a handbook designed for the purpose of establishing mandatory security requirements for federal buildings.  Rather,  the court held it was intended to provide architects and engineers with guidance in the design or renovation of federal buildings. Unlike that case, here, the United States has not pointed to any such language which would provide it with the discretion to ignore 40 USC 1315(a) (a) and its mandatory requirement to protect persons on U.S. property.

A separate mandatory policy was also violated.  Rodney Dyer, the property manager for Hill Partners Inc. at the Old Post Office Pavilion  testified at his deposition that subsequent to "9/11" the United States required three armed guards at each entrance to the building.   It is clear from  his testimony that this was a mandatory policy laid down by the United States, with respect to this building.  See transcript pp 14-15.     However, the security plan that was proposed by Mr. Dyer

---

[1] *In re "Agent Orange" Product Liability Litigation,* 597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2d Cir. 1987),  the district court observed that "the knowledge of employees of one agency may be imputed to those of another if there is some relationship between the agencies." 597 F. Supp. at 796.  In this case, GSA manages federal buildings and property and FPS protects them.  There is clearly, an ongoing relationship between them. Indeed, until 2002, FPS was part of GSA.

and approved by GSA did not assign any guards to the exit  actually used by Ranjit Singh and others as they were leaving the event.  Hence, it appears that GSA approved  a security plan which violated  this mandatory policy.

Since the United States violated mandatory statutes and policies with respect to security at this event, it may not avail itself of the discretionary function defense.

## Even If, Arguendo,  No Mandatory Policy was Violated, the Discretionary Function Defense Is Still  Inapplicable

The Supreme Court has developed a two-pronged test to determine whether particular government conduct falls within the discretionary function exception. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 113 L. Ed. 2d 335, 111 S. Ct. 1267 (1991); *Berkovitz v. United States*, 486 U.S. 531, 100 L. Ed. 2d 531, 108 S. Ct. 1954 (1988).  Under the first prong, the court must determine whether the official's conduct involved "an element of judgment or choice." *Berkovitz*, 486 U.S. at 536.

Under the second prong of the *Gaubert* analysis , the court must consider whether the judgment involved "is of the kind that the discretionary function was designed to shield." *Id.* at 537. The discretionary function exception protects "governmental actions and decisions based on considerations of public policy." *Id.* (exception grounded in "Congress' desire to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort").

In, *Soldano v National Park Service*. 453 F.3d 1140; 1148, (9th Cir 2006), the court held that although the design of a road was shielded by the discretionary function exception, the element of choice involved in the Park Service's decision not to implement a speed limit on the Road, consistent with its safety guidelines, resembled more a departure from safety considerations than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors. It also held that such a decision did not entail a protected, discretionary selection of the means used to meet a general policy goal. This type of distinction was also applied in *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031-32 (9th Cir. 1989), where the court held that the discretionary function exception shielded the government from liability arising from the consequences of its design of a canal, but did not protect the government from its negligent construction of the canal. See also: *Bagner v. United States*, 428 F. Supp. 2d 101 (N.D.N.Y. 2006), **(**In a suit against for injuries from a jet ski accident at a submerged dam at a federal lock, the government was not entitled to Fed. R. Civ. P. 12(b)(1) dismissal for lack of subject matter jurisdiction. Placement of warning signs and/or buoys did not fall within the discretionary function exception to the Suits in Admiralty Act.)

Plaintiff submits that the situation in this case is more akin to the implementation of a safety scheme rather than a decision designed to meet a general policy goal. The decision at issue in this case, that is whether or not to post guards to monitor the dispersal of the attendees from the event, is surely the kind of detailed decision which is designed to implement a general safety policy rather than a policy decision itself. The fact that the decision involved the very minor allocation of resources, in this case, manpower, does not mean that it is automatically to be

considered a policy decision.  In this case, the allocation of manpower needed to provide a security presence in the pedestrian plaza and Pennsylvania Ave. N.W. at the end of the event, would have been truly minimal.  A guard or two, for probably less than half an hour, one man hour at most, would probably have been sufficient to prevent this tragedy.  To characterize such a minimal allocation of resources as  a decision involving a matter involving choices among political, economic, and social factors, is fanciful and it would mean, essentially, that the United States could ignore a federal statute, requiring it to provide security, with impunity.

None of the cases, relied upon by the United States, require a different conclusion.  In *Hughes v. United States*,  110 F.3d 765, 768 (11th Cir. 1997), the appellant was shot in the parking lot of a United States Post Office. Appellant brought suit under the Federal Tort Claims Act (FTCA), 28 U.S.C.S. §§ 1346, 2671-80, alleging negligence on the part of the United States Postal Service in failing to provide adequate security. In her complaint, she alleged negligence on the part of the Postal Service, in providing inadequate lighting around the building and in the parking lot during nighttime hours; and installing and maintaining hedges, shrubbery, and trees on the premises that provided places for criminals to hide and obscured the artificial lighting.  The trial court dismissed appellant's claim for lack of subject matter jurisdiction because, it held that the alleged negligent conduct by the Postal Service fell within the discretionary function exception of the FTCA. The court found that there were no fixed or readily ascertainable standards regarding post office security.  However, the type of  negligence that plaintiff was alleging in that case, was clearly structural, that is, she  was saying the lighting should have been better and the layout of  trees and vegetation on the property was negligent.

Such considerations, clearly implicate questions concerning the allocation of resources, such as installing more lights or rearranging landscaping. No such considerations are involved in this case. Here, plaintiff, is arguing that there should have been a truly minimal security presence. Hence, this case is similar to *Gotha v. United States*, 115 F.3d 176 , 181 where the court, in finding that the discretionary function defense did not apply, noted, that "Certainly there is a distinction between contracting for the delivery of a weapons system costing millions or billions of dollars, and the material and labor costs of a few hundred dollars to construct a set of wooden steps, or even the lesser expenditures of erecting a barricade and directing personnel to use alternate routes." In the latter case, the court held that the discretionary function defense did not apply. In this case, the expense involved would almost certainly been even less that that in *Gotha.* As noted above, probably less than one man hour of labor would have been involved in monitoring the dispersal of the crowd passing over government property. [2]

The court in *Hughes*, also held that "…., we need not inquire whether any particular postal employee here engaged in a weighing of policy considerations in the decision regarding security at the Ocala Post Office. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed

---

[2]   For a post-*Gaubert* commentary of the Federal Tort Claims Act, *see* Harold J. Krent, *Preserving Discretion Without Sacrificing Deterrence: Federal Governmental Liability in Tort*, 38 UCLA L. Rev. 871, 898 (1991) ("The discretionary function exception should insulate all agency actions that, like congressional enactments themselves, reflect national policy"); William P. Kratzke, *The Supreme Court's Recent Overhaul of the Discretionary Function Exception to the Federal Tort Claims Act*, 7 Admin. L.J. Am. U. 1, 32 (1993) ("The discretionary function exception should immunize government decisions only when cases present policy questions that do not lend themselves to resolution by adjudication").

that the agent's acts are grounded in policy when exercising that discretion."
*Gaubert,* 499 U.S. at 324, 111 S. Ct. at 1274. " Id. at 769.  In this case though, there
is no evidence that the government ever exercised any discretion with regard to the
Pedestrian Plaza or Pennsylvania Ave. N.W. or security in these areas, at the end of
the event.   We know that the only security that was considered was inside the Old
Post Office Pavilion.  The security plan contained no provision for security outside
the building and Paul Constable of FPS, testified that he could find no evidence
that that agency primarily responsible for security, had done anything with
reference to this event.

     Moreover, in *Macharia v. United States*, 357 U.S. App. D.C. 223; 334 F.3d 61;
another case relied upon by the United States, could hardly be more different from
the instant case. There, the plaintiffs were a class of Kenyans alleged defendant
United States was negligent in failing to prevent terrorists from bombing its
Nairobi embassy.   The plaintiffs  negligence claims included allegations that the
United States 1) failed to provide guidance and advice on improving security at the
Embassy, 2)  failed to provide security equipment to the Embassy, 3)  failed to train
adequately Embassy personnel and contractors to deal with various security
threats, 4)  failed to warn adequately Embassy personnel, and others, of potential
terrorist threats,  and 5) failed to conduct a proper classification of the level of
security risk at the Embassy.   Such considerations, clearly involve major decisions
on how to allocate substantial resources and how to balance for example, access
with security.  It could hardly be more different than the situation presented in the
instant case.

Likewise, in *Zielinski v. United States*, No. 95-2160, 1196 WL 329492(4th Cir. 1996), the court, in an unpublished opinion, decided that the extent and manner of military base security measures, in general, falls within the discretionary function exception in cases under the Federal Tort Claims Act.  In that case,  guards at the entry to a military base had checked a person who subsequently abducted plaintiff, as he entered the base. The complainant was argued that the type of check required was inadequate. Again, this situation is different in kind, from that presented in this case because plaintiff was arguing, essentially, that an entirely different security system should have been permanently installed at a military installation. In this case, as little as one man hour of  labor by security guards was probably all that was required, a truly minimal expenditure, which almost certainly would have avoided  a tragic loss of life.

### CONCLUSION

Based on the foregoing, plaintiff respectfully requests that the defendant's motion to dismiss the claims against it, be denied.

Respectfully submitted,

/s/ Geoffrey D. Allen

Geoffrey D. Allen
D.C. Bar 288142
1730 Rhode Island Ave. N.W.
Suite 206
Washington D.C. 20036
Tel: (202) 778-1167

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2008 a copy of the foregoing Plaintiff's Opposition to the Renewed Motion of the United States to Dismiss was served electronically on :

Timothy W. Romberger, Esquire
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C.  20036-5405
Email: Timromberger1@comcast.net

*Attorney for the George Washington University and*
*The George Washington University South Asian Society*

Scott Douglas Goetsch, Esquire
Moore & Jackson, L.L.C.
305 Washington Avenue
Towson, Maryland  21204
Email: goetsch@moorejackson.com

*Attorney for Defendant, SecTek Inc.*

Blanche Bruce, Esquire
Quan K. Luong, Esquire
United State's Attorney's Office
501 Third Street, N.W.
Washington, D.C.  20530
Email: quan.luong@usdoj.gov; blanche.bruce@usdoj.gov

*Attorney for United States of America*

Robert H. Bouse, Jr. Esquire
Anderson, Coe & King, LLP
201 N. Charles Street, Suite 2000

Baltimore, MD 21201
Email: bouse@acklaw.com

*Attorney for Defendant Hill Partners, Inc.*

/s/ Geoffrey D. Allen
Geoffrey D. Allen

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GURPAL SINGH, as Administrator** | : | |
| **of decedent RANJIT  SINGH,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action No. 06 0574** |
| **v.** | : | **RMC** |
| | : | |
| | : | |
| **SOUTH ASIAN SOCIETY OF THE GEORGE** | : | |
| **WASHINGTON UNIVERSITY,** | : | |
| **Et Al.,** | : | |
| **Defendants.** | : | |

**ORDER**

This matter comes before the Court on the motion of the United States to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and plaintiffs' opposition thereto.  Having considered the submissions of the parties and the entire record herein, it is, this ___ day of _____, 2008 hereby,

ORDERED, that the motion be and hereby is DENIED.

_____
Judge Collyer

**List of Exhibits**

| | |
|---|---|
| Exhibit A | Photos of exit of Post Office Pavilion at 11th St. side |
| Exhibit B | Photo of plaza of Post Office Pavilion at 11th St. side |
| Exhibit C | Photo of steps of Post Office Pavilion at 11th St. side |
| Exhibit D | Photo of Harkanwal Sandhu at location of incident |
| Exhibit E | 3/17/05  Letter from Rodney Dyer to Alcohol Beverage Control Board re: a one-day class G beverage license. |
| Exhibit F | 3/08/05  Letter from Rodney Dyer to US GSA re: building rental application/license application |
| Exhibit G | Special Event License Agreement between GSA and George Washington University. |
| Exhibit H | Deposition of Rodney Dyer pp. 6-7 |
| Exhibit I | Affidavit of Harkanwal Sandhu |
| Exhibit J | Pennsylvania Ave. NW Historic Site Information [nps.gov/paav] |
| Exhibit K | Statute 40 USCS §6701 Transfer of rights and authorities of the Pennsylvania Development Corp. |
| Exhibit L | Deposition of Paul Constable pp. 12-13 |
| Exhibit M | 3/14/05  Email from Rodney Dyer to Office L. Gross re: security request for 3/16/05 event. |
| Exhibit N | Deposition of Paul Constable pp. 12-13 |
| Exhibit O | Deposition of Rodney Dyer pp. 14-15 |
| Exhibit P | Narrative of 4/11/04 incident within the 1100 block of Pennsylvania Ave. NW |
| Exhibit Q | Affidavit of Geoffrey D. Allen |
| Exhibit R | Deposition of Rodney Dyer pp. 33 |
| Exhibit S | Deposition of Rodney Dyer pp. 17 |

| Exhibit T | Deposition of Paul Constable pp. 20 |
|---|---|
| Exhibit U | Defendant's amended response to plaintiff's 2nd set of Interrogatories to the United States of America. |
| Exhibit V | Deposition of Vicki Willmann pp. 5-8 |
| Exhibit W | 2/104/05  Email from Mike Saunders to Vicki Willmann re: summer hours |
| Exhibit X | 6/30/04  Emails between Vicki Willmann and Rodney Dyer re: extending hours for July 4th |
| Exhibit Y | 2/08/05  Emails between Rodney Dyer, Mike Saunders and Vicki Willmann re: OPO retail hours |
| Exhibit Z | Affidavit by SecTek, Inc. [to be supplied] |
| Exhibit AA | Post Orders for Old Post Office Pavilion |