UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GURPAL SINGH, Administrator of decedent RANJIT SINGH,<br><br>           Plaintiff,<br><br>    v.<br><br>SOUTH ASIAN SOCIETY OF THE GEORGE WASHINGTON UNIVERSITY, et al.<br><br>           Defendants. | Case No. 06-0574 (RMC) |

## FEDERAL DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO THE RENEWED MOTION TO DISMISS

### INTRODUCTION

In reply, this Court should grant Defendants', General Services Administration (GSA) and the United States Department of Homeland Security (DHS), motion to dismiss for lack of subject matter jurisdiction. Plaintiff has not established: 1) a mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion; 2) that GSA exercised supervision over Hill Partners' day-to-day operations at the Old Post Office Pavilion; or 3) that DHS or FPS exercised supervision over SecTek's day-to-day operations at the Old Post Office Pavilion. As discussed more fully below, this Court should grant Defendants' motion based on the discretionary function and/or independent contractor exceptions to the Federal Tort Claims Act (FTCA).

## ARGUMENT

I.    **The Court May Consider Matters Outside the Pleadings in Deciding A Motion to Dismiss**

Plaintiff argues that because Defendants presented "matters outside the pleadings" in its "12(b)(6)" motion for failure to state a claim, "the motion must be treated as one for summary judgment and disposed of as provided in Rule 56." *Pl. Opp.* at 1. In its May 21, 2007 Memorandum Opinion (Docket # 69), this Court set forth the legal standard governing motions to dismiss for lack of subject matter jurisdiction.

> Under Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction. . . It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, 'but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction.. . In deciding a 12(b)(6) motion, district courts may typically consider only 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice . . However, the court may, in its discretion, consider matters outside the pleadings, and thereby convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56.

See Memorandum Op. at 3-5 (cases omitted).

Defendants moved to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). See *Def. Mot. to Dismiss* at 7-14. (Docket 62). Plaintiff should not be permitted to recast Defendants' dismissal motion as one for summary judgment thereby requiring Defendants to file a response to its four-page listing of allegedly "materially facts, not in dispute." *Pl. Opp.* at 2-5. Should the Court determine that the summary judgment standard is the appropriate standard of review, Defendants request the opportunity to re-file a motion for summary judgment.

**II.     The Discretionary Function Exception**

As previously mentioned in the dismissal motion, a court lacks jurisdiction to hear claims brought under the FTCA that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved by abused." 28 U.S. C. § 2680(a).  In United States v. Gaubert, 499 U.S. 315, 322-323 (1991), the Supreme Court established a two-part test for determining whether the discretionary function exception applies.  First, the Court must determine whether any "federal statute, regulation, or policy specifically prescribes the course of action for an employee to follow" and if one exists, "the employee has no rightful option but to adhere to the directive" Id.  The second step, which applies when there is no "federal statute, regulation, or policy" and when the "challenged conduct involves an element of judgment" the court must decide "whether th[e] judgment is one of the kind that the discretionary function exemption was designed to shield." Id.

The sole issue before this Court is the first prong of the Gaubert test because this Court has already ruled the posting of the guards at the Old Post Old Pavilion was a discretionary function:

> Here, the decision about where to post security guards—regardless of whether that decision was negligent—is clearly the type of discretionary function that Congress has exempted from the FTCA's waiver of sovereign immunity. Similarly, the selection and supervision of security contractors falls in an area of discretion that is beyond this Court's jurisdiction.  But, that only disposes of the second part of the discretionary function test.

Memorandum Op. at 7 (emphasis added) (internal citations omitted).  As a result of that determination, this Court permitted limited discovery by Plaintiff to determine "whether there was a mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion." (Id.)

To attempt to establish a mandatory policy regarding the placement of security guards, Plaintiff relies on two arguments. First, Plaintiff argues that the word "shall" in a selected portion of 40 U.S.C. § 1315(a) creates a mandatory policy. See Pl. Opp. at 9. Second, Plaintiff argues that a **GSA** employee "laid down" an unwritten oral policy requiring **DHS** to maintain three armed guards at each entrance to the Old Post Office Pavilion. Both of those arguments are factually and legally incorrect.

### A. 40 U.S.C. § 1315 does not Constitute a Mandatory Policy because it does not Specifically Prescribe a Course of Action

Plaintiff is correct in that the actual wording of 40 U.S.C. § 1315(a) states, "[T]he Secretary of Homeland Security [] shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government…and the persons on the property." However, Plaintiff fails to provide the Court with the rest, and more applicable portion, of the statute which states:

> The Secretary, in consultation with the Administrator of General Services, may prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and the persons on the property.

40 U.S.C. § 1315(c)(1). This language shows that the statute, when read in its entirety, does not specifically prescribe a course of action for an employee of the United States to follow. See Gaubert, 499 U.S. at 323, (discretionary function exception will not apply when a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.") (quoting Berkovitz v. United States, 486 U.S. 531, 536, (1988)); Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809, (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Rather, the statute specifically states that DHS may, as necessary, prescribe regulations to carry out the statute.

4

Two cases are instructive on this issue. First, in <u>Fitzsimmons v. United States</u>, 496 F.Supp.2d 1035 (D.N.D. 2007), plaintiff argued that the Bureau of Indian Affairs ignored enforcing certain laws and that BIA was statutorily mandated to enforce the law. In rejecting this argument, the court focused on the plain wording of the statute and noted that,

> The relevant inquiry is whether controlling statutes, regulations, and administrative policies mandated that BIA law enforcement employees investigate and enforce, <u>in a specific manner</u>, the violations of crimes and ordinances.

<u>Id.</u> at 1040 (emphasis added) (citations omitted).

Second, in <u>Graham v. United States</u>, 2002 WL 188573 (E.D. Pa. 2002) (unreported), plaintiff argued that the Bureau of Prisons failed to follow a mandatory statute regarding prisoner care. In <u>Graham</u>, plaintiff argued that because the statute contained the word "shall," it was automatically mandatory and, thus, the discretionary function exception could not apply. In rejecting this argument, the court explained that, "The mandatory duty of care [in the statute] <u>does not dictate the manner</u> in which the duty must be fulfilled." <u>Id.</u> at *4 (emphasis added) (citations omitted).

Similarly, in the present case, the statute, 40 U.S.C. § 1315, cited by Plaintiff does not mandate that DHS and/or GSA protect the buildings, grounds, and property and the persons on the property in any specific manner or under a specific course of conduct. Thus, Plaintiff's first argument that the statute constitutes a mandatory policy is simply incorrect when compared with the plain wording of the entire statute and applicable law.

B.  **GSA did not lay down a Mandatory Oral Policy Governing DHS's Placement of Armed Guards at the Exits/Entrances of the Old Post Office Pavilion**

Plaintiff next argues that "[a] separate mandatory policy was also violated." *Pl. Opp.* at 12. In support, Plaintiff claims that Rodney Dyer's[1] deposition testimony "clear[ly]" establishes that the United States "laid down" an unwritten mandatory policy requiring three armed guards at each entrance to the Old Post Office Pavilion. (Id.).

Even assuming that an unwritten practice can satisfy Gaubert's first-prong, which Defendants do not concede, "Rel[iance] on anecdotal testimony to discern the nature of agency policy 'is usually a last-ditch resort.'" Dwyer v. United States, 76 F.Supp.2d 154, 159 (D.N.H. 1999) (quoting Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1999). See Gaubert, 499 U.S. at 324 (courts are only to consult established government policy in discretionary function inquiry); Macharia v. United States, 334 F.3d 61, 66 ( D.C. Cir. 2003) (leaving open the question of whether an oral practice can satisfy Gaubert's first prong). Here, Plaintiff's reliance on Mr. Dyer's testimony does not establish a "federal statute, regulation, or policy…" that "specifically prescribes a course of action for an employee to follow" which "the employee has no rightful option but to adhere to the directive." Gaubert, 499 U.S. at 322 (internal quotations omitted). Plaintiff's reliance on Mr. Dyer's testimony to try to establish a mandatory policy where one does not exist, is indeed, a last-ditch effort.

To understand what Mr. Dyer stated during his deposition, it is important to set forth the following exchange between Mr. Dyer and Plaintiff's counsel in full context:

Q: Okay. And what follows appears to be a request for certain security guards to be posted at certain security posts, is that correct?
A: That is correct, sir.

---

[1] Rodney Dyer, is the general manager of the management company Hill Partners, which manages the Old Post Pavilion building. See Dyer Deposition at pp, 6-7. (Dyer Deposition - Attachment A).

6

> Q: Okay. And did you formulate that security plan?
> A: That was done based upon what I understood the requirements for entrances at the Pavilion. There is a certain number of guards required at each entrance.
> Q: Okay, all right. And who required a certain number of guards at each entrance?
> A: That is a GSA requirement.
> Q: Okay. And where was that set forth?
> A: At least three guards per entrance.
> Q: Okay, all right. Was there a particular regulation that required that?
> A: No, that was just general knowledge of what was required for us to have an entrance open—any entrance open—whether it's for a special event or just general operation, daily operations; three guards were at least required.
> Q: Okay. And how did you become aware of that requirement; who had told you about it?
> A: That was done through general conversations with different GSA personnel.
> Q: Okay, GSA personnel—how about DHS, Department of Homeland Security personnel?
> A: No, I don't talk directly with them, with the DHS personnel.
> Q: Okay. Now, could you tell me who the GSA personnel were who told you about the three guards per entrance requirement?
> A: I would have to say Vicki Willmann and, I believe—she was the person at the time, I want to say, maybe, Linda Freeman.
> Q: Linda Freeman?
> A: I'm thinking whoever the acting property manager at the time was; I believe it was Linda Freeman
> ****
> Q: And it was communicated to you, was that [the three armed guards was] a mandatory requirement?
> A: It wasn't given to me to implement; I just knew about that general policy for each door.
> Q: Okay.
> A: I had nothing to do with putting guards at the door; that was something that I just had a general knowledge of.

R.Dyer Deposition at p.12 lines 7-22; p. 13 lines 1-19; p. 14 lines 19-22; p. 15 lines 1-4).

The full exchange supports Defendants' position that there was no mandatory policy for the placement of the security guards. First, Mr. Dyer readily admits that there is no regulation that requires three armed guards per entrance. To the contrary, Mr. Dyer's understanding of the requirement stems from "general knowledge" based on conversations with "different GSA

7

personnel." At its core, what Mr. Dyer really says is that a **GSA** employee told him, through general conversations, about an unwritten "GSA requirement" that each entrance required three armed security guards. Second, the exchange highlights Mr. Dyer's confusion between DHS and GSA.[2] According to the deposition testimony, a GSA employee essentially promulgated an unwritten policy for DHS's contract guards to follow. To suggest that a GSA building manager (Ms. Freeman) or even a mid-level manager (Ms. Willmann) possesses the authority to prescribe an unwritten mandatory policy governing DHS's employees or contractors constitutes, at best, a last ditch-resort.

Mr. Dyer's confusion between GSA and DHS is also apparent when he contradicts his own testimony. After the above exchange occurred, Mr. Dyer stated that, "[The three armed guards] requirement was <u>virtually required by GSA or maybe DHS</u> that all doors be secured with armed guards." R.Dyer Deposition at p.38, l.15-17 (emphasis added). Thus, Mr. Dyer seemingly recants, or at the very least, backtracks from his earlier testimony by stating that the three armed guards were not, in fact, required, but were instead "virtually required." In addition, despite stating that **GSA** required three armed guards and that he does not "talk directly with [DHS]," he nevertheless proceeded to testify that maybe the three armed guard requirement came from DHS.

Plaintiff also fails to take into account the deposition testimony of Paul D. Constable, the Regional Director of the National Capital Region for the Federal Protective Service. See P.Constable Deposition at p.6, l.10-14. During his deposition, Mr. Constable expressly stated, "I

---

[2] Mr. Dyer repeatedly confuses DHS and GSA throughout his testimony. For instance, it is beyond question that DHS entered into a contract with SecTek for security guard services. (See Reply to the Opposition at Docket 66, Attachment A - Statement of Work). Yet, during his deposition, Mr. Dyer insists that GSA hired SecTek. See R.Dyer Deposition at p.40, l.1-11; p.53, l.9-p.54, l.5.

know of no policy or regulation that requires the placement of security guards at exits" of the Old Post Office Pavilion. P.Constable Deposition at p.71, l.7-13[3]. Similarly, in a sworn declaration, Mr. Constable stated, "…I am not aware of any statutes, regulations, directives or policy related to a requirement to post guards at the exits for special events at the Old Post Office Pavilion building."[4] Unlike Mr. Dyer's conflicting testimony, Mr. Constable provides clear, consistent testimony and sworn statement. Moreover, Mr. Constable's testimony and sworn statement verifies Plaintiff's inability to uncover any written mandatory policies regarding the placement of security guards at the exits of the Old Post Office Pavilion. Id.

After months of discovery, Plaintiff cannot point to a written mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion. Instead, Plaintiff solely offers general knowledge of a general, unwritten policy orally issued by either a **GSA** building manager or mid-level manager regarding **DHS** security guard requirements. Plaintiff's proffered evidence does not rise to the level necessary to satisfy Gaubert's first prong.

    **C.**    **Plaintiff Seeks to Revisit the Second Prong of the Gaubert Test and Disregards the May 21 Order**

As noted earlier, the Court already disposed of the second part of the discretionary function test in Defendants' favor. See Memorandum Op. at 7. Nevertheless, Plaintiff spends nearly six pages (pages 13-18) revisiting the second prong of the Gaubert test. The Court plainly stated that Plaintiff would be limited to conducting discovery on the jurisdictional question and "may not delve into discovery on the merits of their tort claims." Id at 11. In clarifying this position, the Court stated, "For example, the United States's 'knowledge of prior

---

[3]    Paul Constable Deposition - Attachment B.

[4]    See Reply to the Opposition, Docket 66 (Attachment B - Declaration of Paul Constable).

9

security problems at the [Old Post Office Pavilion] and any steps taken by it to address such problems,'…are irrelevant to the threshold jurisdictional question." Id. at 11.

Yet, despite this clear language, Plaintiff's opposition is laced with merit-based arguments. For example, Plaintiff states, "There had been multiple, serious, assaults which had occurred at the same event, the year before, as the event ended." Pl. Opp. at 3, ¶ 10. Plaintiff even attached a document obtained by The George Washington University from DHS in order to show that, "The United States also was aware of problems which had occurred at the event the previous year." Pl. Opp. at 11; Pl. Opp. at Exhibits P and Q. In light of this Court's opinion, the Court should disregard Plaintiff's merit-based arguments, exhibits, and positions because they have no bearing on whether this Court may exercise subject matter jurisdiction. Accordingly, Plaintiff has not established a mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion.

### III.    The Independent Contractor Exception

Finally, Plaintiff has not shown that the Federal Government had day-to-day supervision over Hill Partners' and SecTek operations. See United States v. Orleans, 425 U.S. 807, 815, (1976). Plaintiff sets forth five reasons why the independent contractor exception is inapplicable: (a) Defendant provided an inadequate level of security (Pl. Opp. at 6); (b) GSA's knowledge, familiarity, and control over entrances and exits (Pl. Opp. at 7); (c) GSA approved the security plan for the event (Pl. Opp. at 8); (d) the United States exercised the power to hire, fire, and direct security operations (Pl. Opp. at 8); and, (e) the Post Orders establish detailed control over virtually every aspect of security (Pl. Opp. at 8).

A.  **The Level of Security Provided by Defendant is a Discretionary Function and has Nothing to do with the Independent Contractor Exception**

According to Plaintiff, the independent contractor exception cannot apply because Defendant "failed . . . to provide [security] services on its land outside the Old Post Pavilion, after the event." *Pl. Opp.* at 6. Plaintiff 's argument about the level of security is a discretionary function issue which has already been decided by this Court. As noted by this Court, the relevant issue for inquiry is, "whether Hill Partners and/or SecTek were independent contractors." Memorandum Opinion at 11. The issue of *how* many security guards to hire or *where* to station those guards are purely matters of discretion that comprise the second prong of the Gaubert analysis. Such issues are simply not germane to the independent contractor exception. Courts in this Circuit have previously rejected such arguments and this Court should too. See Haygan v. United States, 627 F.Supp. 749 (D.D.C. 1986) (objecting to level of security provided); Turner v. United States, 473 F.Supp. 317 (D.D.C. 1979) (plaintiff argued inadequate security, but court held maintaining two guards clearly discretionary).

B.  **GSA's Knowledge, Familiarity, and Control over Entrances and Exits does not Constitute Day-to-Day Supervision or Control over the Contractor's Detailed Physical Performance**

Plaintiff's position on this point appears to stem primarily from the following passage:

> GSA officials have offices in the Old Post Office Pavilion. GSA officials regularly inspected the building according to Mr. Dyer, and were very familiar with its layout. E-mails between Ms. Willmann and Mr. Dyer also show a high degree of familiarity with the exits at the building, including the 11th St. Plaza….

Pl. Opp. at 7. This conduct does not rise to the level required to constitute day-to-day supervision or control over the contractor's detailed physical performance.

For starters, it is not entirely clear whether Plaintiff has effectively abandoned the notion that GSA exercised supervision over Hill Partners' day-to-day operations at the Old Post Office

11

Pavilion. Plaintiff seems to focus his efforts on showing that GSA exercised supervision over security operations in general. Regardless, Defendants readily submit that GSA has offices at the Old Post Office Pavilion. But, simply having an office in a building does not mean that GSA exercised day-to-day supervision or control over the contractor's detailed physical performance.

Similarly, Defendants admit that GSA conducts inspections of the building and is familiar with its layout. The building is, after all, owned by the Federal Government and GSA is, after all, routinely referred to as the Government's landlord. Thus, it should come as no surprise that GSA's employees conduct inspections of the building, know its layout, and are familiar with the locations of the exits and entrances. Again, such knowledge does not prove that GSA exercised day-to-day supervision or control over the contractor's detailed physical performance.

Lastly, Plaintiff points to e-mails between GSA and Hill Partners to "show a high degree of control over specific entrances to the building and even the hours that they will be open." *Pl. Opp.* at 8. Again, Defendants admit that the Old Post Office Pavilion falls within GSA's jurisdiction. However, deciding when to open and close a building has nothing to do with GSA exercising day-to-day supervision or control over the contractor's detailed physical performance.

C.  **"GSA" Approval of the Security Plan for the Event D
    Does not Constitute Day-to-Day Supervision or Detailed Physical Performance**

On this point, Mr. Dyer's deposition testimony contradicts the assertions contained in Plaintiff's opposition. During his deposition, Mr. Dyer stated that he needed to seek approval from GSA to hold an event, but went through DHS and the contract security contractor for security requirements. See R.Dyer Deposition at p.10, lines 18 -22; p.11, lines 3-6. Accord R. Dyer Deposition at p.19, lines 3-6 (all security plans had to go through DHS). At a later point, Mr. Dyer testified that DHS approved the security plan. See R.Dyer Deposition at p. 29, l.11-17.

However, in its opposition, Plaintiff states that, "The security plan formulated by Mr. Dyer <u>was submitted to GSA</u> for its approval." *Pl. Opp.* at 8 (emphasis added).

In reality, the deposition testimony shows that Hill Partners and SecTek arranged for security on the night of the event. In explaining Hill Partners' role, Mr. Dyer stated that it has "always organized special events." R. Dyer Deposition at p. 43, lines 11-12. Although some requirements may have changed after '9/11," Mr. Dyer stated that, "[Hill Partners was] still required to request security for [special events], and we had to go through DHS." R. Dyer Deposition at p.44, lines 17-19. Moreover, Mr. Dyer testified that, "[Hill Partners was] required to hire [SecTek] if they were the current security company…." R. Dyer Deposition at p.45, lines 5-8.

When Mr. Dyer formulated the security plan for the event, he sent an e-mail to Lt. Gross with SecTek on March 14, 2005. *Pl. Opp.* at Exhibit M. In that e-mail, Mr. Dyer requested that Lt. Gross "review the following security request and make any changes before I forward to DHS." <u>Id</u>. Nobody from DHS or GSA was on that initial e-mail. It is not until the next day, on March 15, 2005, that Mr. Dyer forwarded the e-mail to Linda Jackson with DHS. <u>See Id</u>. When Plaintiff deposed Ms. Jackson, she specifically stated that her role was merely to prepare documentation and she had no input into the number of guards that were assigned to a particular exit. <u>See</u> L. Jackson Deposition[5] at p.11, l.7-p.12, l.8. Mr. Dyer testified in a similar manner during his deposition about Ms. Jackson's role:

> A: You know, I don't think Linda Jackson really looks at it and goes like, well, no you—in terms of, you know, changing the security requirements, I don't—she doesn't do that, she just basically processes the paperwork.
> Q: Yes.
> A: She doesn't take it and go, well, I know you guys need more or less security; no, she simply approves the paperwork.

---

[5] Linda Jackson Deposition at Attachment C.

R. Dyer Deposition at p.21, l.13-l.21. Thus, Mr. Dyer agreed that Ms. Jackson merely approved paperwork, and not the security plan.

Moreover, with regards to Defendants, Mr. Dyer admitted that, to his knowledge, nobody from the government evaluated or reviewed the security plan:

> Q: Okay, well was there anybody in the government who did go through the process of reviewing it and saying—evaluating whether you needed more or less?
> A: We have—no, I don't—there are no persons that we've been made aware of. There was, as you see in my letter, I sent that request—my first line of management, I sent that request to SecTek so that they, in fact, could provide that change, if necessary, for the event.
> Q: Okay.
> A: But we've not been given any particular person, that we need to contact and say, hey—in DHS, that is.
> Q: Yes.
> A: You know, would like to review this and make any changes, if necessary; we've not been given that directive.

R.Dyer Deposition at p.21, l.22-p.22, l.16. What Mr. Dyer did admit, therefore, is that he submitted the security plan to SecTek in order for SecTek to provide changes. SecTek did in fact review the proposed security plan submitted by Mr. Dyer and even requested that a supervisor be added to the security plan. *Pl. Opp.* at Exhibit M.

Such testimony is also consistent with that given by GSA's Vicki Willmann.[6] When asked whether she had ever seen a security plan for the event, Ms. Willman stated, "No." V. Willmann Deposition at p.38, l.17-20. Similarly, when asked whether she ever had any discussions with SecTek, she responded, "No." V.Willmann Deposition at p.18, l.7-9.

Plaintiff's position that GSA approved the security plan is inconsistent with the deposition testimony of Mr. Dyer, Ms. Willmann, and the exhibits attached to Plaintiff's opposition. Plaintiff's main witness (Mr. Dyer) conclusively stated that nobody from the

---

[6] Vicki Willman Deposition at Attachment D.

14

government evaluated or reviewed the security plan. Mr. Dyer's testimony actually shows that SecTek, not Defendant, evaluated and suggested changes to the plan.

### D. The Power to Hire, Fire, and Direct Security Operations does not constitute Day-to-Day Supervision or Detailed Physical Performance

Much like their other arguments, Plaintiff relies, to a large degree, on Mr. Dyer's testimony that the United States exercised the power to "hire, fire and direct security operations at the building." Pl. Opp. at 8. See, e.g., J.S. ex rel. N.S. v. Attica Central Schools, 386 F.3d 107, 110 (2d Cir. 2004) (court may not rely on conclusory or hearsay statements contained in affidavits). At first blush, the first two parts of Mr. Dyer's statement cannot prevent the Government from invoking the independent contractor exception or the exception could never be invoked. In order to have an independent contractor, the Government must first "hire" a contractor. In addition, the Government has the ability to "fire" a contractor for a variety of reasons. See, e.g., 48 C.F.R. § 49.000, et seq. (2007) (terminations of contracts). Simply because DHS hired and could fire SecTek and GSA hired and could fire Hill Partners does not really prove anything.

With regard to directing security operations, Plaintiff does not provide much more than interspersed uses of the word "direct" in various places throughout their opposition. See U.S. ex rel. J. Cooper Assocs., Inc. v. Bernard Hodes Group, Inc., 422 F.Supp.2d 225, 233 (D.D.C. 2006) ("court has no duty to accept factual allegations as true, especially sweeping, conclusory statements") (citations omitted). Simply put, Plaintiff has not met its burden of showing that Defendants supervised the day-to-day operations or controlled the detailed physical performance of SecTek and/or Hill Partners.

### E. Detailed Regulations, Specifications, or Standards in Performing Work do not Defeat the Independent Contractor Exception

Plaintiff also contends that the Bhangra Blowout event "took place in the context of extremely detailed control over virtually every aspect of security operations at the building as is shown by the Post Orders" (Pl. Opp at 8)  To the contrary, the contractor's Statement of Work under the heading "Typical Duties" set forth the typical standard security-related duties required to be performed by the guards.[7]

Allegations that a contractor was required to comply with detailed regulations, specifications or standards in performing the work do not establish that the United States supervised the contractor's day-to-day operations or controlled the detailed physical performance of the contractor's work, and do not, standing alone, vitiate the contractor exclusion. Logue v. United States, 412 U.S. 521, 529-530 (1971).  In this case, the United States did not supervise SecTek's day-to-day operations or control the detailed physical performance of its work.  In fact, as stated in Plaintiff's opposition, "Paul Constable, an official with FPS testified that he found no evidence of any steps taken by his agency in connection with the event at all."  Pl. Opp. at 7.  The fact that the Government sets forth standards in its contract does not nullify the independent contractor exception.

Plaintiff did not establish that the Federal Government supervised the contractor's day-to-day operations or controlled its detailed physical performance.  Accordingly, Plaintiff's claims against Defendant should be dismissed based on the independent contractor exception to the Federal Tort Claims Act.

---

[7]  See Reply to the Opposition at Docket # 66, Attachment A - Statement of Work.

## CONCLUSION

Based on the foregoing, Defendants General Services Administration and the United States Department of Homeland Security request that Plaintiff's claims against them be dismissed with prejudice.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BLANCHE L. BRUCE , D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530

Of Counsel
Timothy Tozar
General Services Administration

Christopher Gaffney
Department of Homeland Security