# ATTACHMENT A

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

----------------------------------x

GURPAL SINGH, as Administrator    )

of Decedent Ranjit Singh,         )

      Plaintiffs,             ) Civil Action No.

  v.                              )   06 0574 RMC

GEORGE WASHINGTON UNIVERSITY,     )

et al.                            )

      Defendants.             )

----------------------------------x

                           Washington, D.C.

                           Wednesday, November 28, 2007

Deposition of:

                      RODNEY DYER

called for examination by counsel for Plaintiffs, pursuant to notice, at 1821 Jefferson Place, N.W., Washington, D.C. 20036, before Joseph Kanahele, Jr. of Capital Reporting Company, a notary public in and for the District of Columbia, beginning at 10:42 a.m., when were present on behalf of the respective parties:

# Capital Reporting Company

2 (Pages 2 to 5)

Page 2

1  APPEARANCES
2  On behalf of the Plaintiffs:
3    GEOFFREY D. ALLEN, ESQUIRE
4    1730 Rhode Island Avenue, N.W.
5    Suite 206
6    Washington, D.C. 20036
7    (202) 778-1167
8  On behalf of the Defendant, George Washington University
9  (via teleconference):
10   TIM ROMBERGER, ESQUIRE
11   Law Offices of Tim Romberger
12   1025 Connecticut Avenue, N.W.
13   Suite 1000
14   Washington, D.C. 20036
15   (703) 582-6494 On behalf of the Defendant, Hill
16  Partners, Inc.:
17   ROBERT H. BOUSE, JR., ESQUIRE
18   Anderson, Coe & King, L.L.P.
19   201 North Charles Street
20   Suite 2000
21   Baltimore, Maryland 21201
22   (410) 752-1630

Page 3

1  APPEARANCES (CONT.)
2
3  On behalf of the Defendant, the District of Columbia:
4    BLANCHE L. BRUCE, ESQUIRE
5    U.S. Attorney's Office for the
6    District of Columbia
7    555 4th Street, N.W.
8    Washington, D.C. 20530
9    (202) 307-6078
10
11 On behalf of the Defendant, U.S.
12 General Services Administration:
13   TIMOTHY C. TOZER, ESQUIRE
14   Assistant Regional Counsel
15   Office of Regional Counsel
16   GSA National Capital Region
17   U.S. General Services Administration
18   7th & D Streets, S.W.
19   Suite 7045
20   Washington, D.C. 20407
21   (202) 708-9882
22

Page 4

1  CONTENTS
2  EXAMINATION BY:                          PAGE
3    Mr. Allen, Counsel for Plaintiffs        5
4    Mr. Bouse, Counsel for Defendant,       53
5    Hill Partners, Inc.
6  RODNEY DYER DEPOSITION  EXHIBIT*        PAGE
7  1  Email from Rodney Dyer regarding      11
8     OPO Security Request dated
9     March 14, 2005
10          (*Exhibit attached to transcript.)

Page 5

1  PROCEEDINGS
2  WHEREUPON,
3          RODNEY DYER
4  called as a witness, having been first duly sworn,
5  was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFFS
7  BY MR. ALLEN:
8    Q  Can you state your name for the record, please,
9  sir?
10   A  Rodney Dyer.
11   Q  Okay. Mr. Dyer, my name is Geoff Allen. I
12 represent Gurpal Singh, the father of Ranjit Singh, who
13 has sued The George Washington University; the South
14 Asian Student Society of The George Washington
15 University; Hill Partners, Inc.; SecTek; and the United
16 States, in connection with his death -- the
17 circumstances of his death. You're not an individually
18 named defendant, and it's not anticipated you ever will
19 be. We're here to ask you questions about a very
20 specific area today concerning the role the United
21 States played in this. I don't think the deposition is
22 going to last too long; but, if any time you want to

Page 6

1  take a break, of course, just let me know and we'll
2  accommodate that. If at any time you wish to confer
3  with your counsel, you're free to do so; although I
4  would ask you, if there's a pending question and if
5  you're able to answer the question, to first answer the
6  question and then confer with counsel. If you want to
7  do that out of the room, that's fine, we can accommodate
8  that too.
9      A  Yes, sir.
10     Q  If my questions aren't clear, please let me
11 know; I'm more than happy to rephrase.
12     A  Yes, sir.
13     Q  And that's about it.
14     A  Yes, sir.
15     Q  What do you do for a living, sir?
16     A  I am a general manager for Hill Partners, which
17 consist of property management, commercial properties.
18     Q  Okay. How long have you been with Hill
19 Partners for?
20     A  I've been with Hill Partners approximately 10
21 years.
22     Q  Ten years?

Page 7

1      A  Ten years.
2      Q  And where are you based, where is your office?
3      A  My office is based out of The Old Post Office
4  Pavilion, located at 1100 Pennsylvania Avenue.
5      Q  Okay. And is The Old Post Office Pavilion one
6  of the buildings that you manage?
7      A  Yes, sir.
8      Q  Okay. And how long have you managed it for?
9      A  I've been at that site since 1990.
10     Q  Okay. And so you were there prior to your time
11 with Hill Partners?
12     A  Yes, sir.
13     Q  Okay. Who were you with?
14     A  I was with General Growth Properties.
15     Q  Okay.
16     A  And Rappaport Management.
17     Q  Okay. And did both of those companies at times
18 manage the building?
19     A  Yes, sir.
20     Q  And then Hill Partners took over the management
21 responsibilities?
22     A  Yes, sir.

Page 8

1      Q  And you moved to Hill Partners?
2      A  Yes, sir.
3      Q  Okay. And so I take it from that, then, that
4  Hill Partners assumed management responsibilities for
5  The Old Post Office Pavilion around about 1997, would
6  that be right?
7      A  I believe it was 1996; I don't know exactly,
8  but I think it was June of 1996, I believe.
9      Q  Okay, all right. But it sounds like your
10 particular role didn't change that much, is that
11 correct?
12     A  That is correct.
13     Q  Okay, all right. And you continue in that role
14 today, is that correct, sir?
15     A  Yes, sir.
16     Q  Okay, all right. As you know, I'm now here to
17 ask you particular questions about an event which
18 occurred March 26 and March 27, 2005, which was -- I
19 believe -- it was referred to as the after-party to the
20 Bhangra Blowout?
21     A  Yes, sir.
22     Q  You're familiar with that event?

Page 9

1      A  Yes, sir.
2      Q  Okay.
3         MR. BOUSE: Mr. Allen, so that we don't get
4  off on the wrong foot --
5         MR. ALLEN: Right.
6         MR. BOUSE: I understand that Mr. Dyer is not
7  going to answer any questions at this point about the
8  actual event itself --
9         MR. ALLEN: Correct.
10        MR. BOUSE: Since you've already heard that
11 event?
12        MR. ALLEN: Right, not -- well, --
13        MR. BOUSE: You can ask general questions
14 about where he had approval from or things like that,
15 but I'm not going to allow him to get into the actual
16 number of security guards, where they were located or
17 anything like that. That's part of the jurisdictional
18 issue with the United States.
19        MR. ALLEN: Well, to the extent to which the
20 United States, you know, and he sought approval for a
21 particular security arrangement --
22        MR. BOUSE: That's fine.

Capital Reporting Company

4 (Pages 10 to 13)

Page 10

1  MR. ALLEN: Yeah, I'm not --
2  MR. BOUSE: In general terms, that's fine.
3  MR. ALLEN: Well, I'm --
4  MR. BOUSE: Well, let's go --
5  MR. ALLEN: Yes.
6  MR. BOUSE: I just want to put you on notice
7  without putting you on the spot.
8  MR. ALLEN: Yeah, no, I understand. I know
9  what you're saying and that's okay. In other words,
10 this isn't a deposition about what happened that night.
11 MR. BOUSE: That's exactly right.
12 MR. ALLEN: Yeah, okay.
13 BY MR. ALLEN:
14   Q  Did you play any role in the provision of or
15 the planning for security for the event that I've just
16 mentioned on March 26 and March 27, 2005?
17   A  Yes.
18   Q  Okay. What role did you play?
19   A  My role, which has been like any other event,
20 is to seek approval from GSA for an event; and, once
21 that event is approved, submit a recommendation for
22 security requirements for the event.

Page 11

1   Q  Okay.
2   MR. BOUSE: Recommendation to whom, Mr. Dyer?
3   THE WITNESS: I will go through DHS, which is
4  the Department of Homeland Security, and the contracting
5  security office -- the contract security contractor, I'm
6  sorry.
7  BY MR. ALLEN:
8   Q  Okay. I'm going to have this package of
9  materials marked as Deposition Exhibit No. 1. Let me
10 show you this, what's been marked as Deposition Exhibit
11 No. 1.
12      (Rodney Dyer Exhibit No. 1 --
13       "Email from Rodney Dyer regarding
14       OPO Security Request dated
15       March 14, 2005 -- was marked for
16       identification.
17     If we could start on page -- there's some
18 numbers on the bottom of the page, page 000124, the
19 first page. This appears to be -- or the top of it
20 appears to be -- an email sent by Rodney Dyer to a
21 gentleman called Gross, is that correct?
22   A  That is correct, sir.

Page 12

1   Q  Okay. And who was Mr. Gross?
2   A  Officer Gross was the security supervisor at
3  the time for SecTek.
4   Q  Okay, all right. And in the email you ask him
5  to review the security request, correct, that you made?
6   A  Yes, sir.
7   Q  Okay. And what follows appears to be a request
8  for certain security guards to be posted at certain
9  security posts, is that correct?
10  A  That is correct, sir.
11  Q  Okay. And did you formulate that security
12 plan?
13  A  That was done based upon what I understood the
14 requirements for entrances at the Pavilion. There's a
15 certain number of guards required at each entrance.
16  Q  Okay, all right. And who required a certain
17 number of guards at each entrance?
18  A  That is a GSA requirement.
19  Q  Okay. And where was that set forth?
20  A  At least three guards per entrance.
21  Q  Okay, all right. Was there a particular
22 regulation that required that?

Page 13

1   A  No, that was just general knowledge of what was
2  required for us to have an entrance open -- any entrance
3  open -- whether it's for a special event or just general
4  operation, daily operation; three guards were at least
5  required.
6   Q  Okay. And how did you become aware of that
7  requirement; who had told you about it?
8   A  That was done through general conversations
9  with different GSA personnel.
10  Q  Okay, GSA personnel -- how about DHS,
11 Department of Homeland Security personnel?
12  A  No, I don't talk directly with them, with the
13 DHS personnel
14  Q  Okay. Now, could you tell me who the GSA
15 personnel were who told you about the three guards per
16 entrance requirement?
17  A  I would have to say Vicki Willman and, I
18 believe -- she was the person at the time, I want to
19 say, maybe, Linda Freeman.
20  Q  Linda Freeman?
21  A  I'm thinking whoever the acting property
22 manager at that time was; I believe it was Linda

Page 14

1  Freeman.
2  Q  Okay. If you just flip to page 2 for a second
3  (page 000125), there's an email to Linda Jackson; is
4  that a different person from Linda Freeman?
5  A  No, she's with DHS.
6  Q  Oh, okay. So Linda Freeman is a different
7  person?
8  A  Yes, sir.
9  Q  And she's with GSA?
10 A  She's with GSA?
11 Q  Okay, all right. And how long -- when did you
12 first become aware of that requirement; when was that
13 first communicated to you?
14 A  That was communicated to me shortly after
15 September 11, 2001 when security was placed at the
16 entrance of each door.
17 Q  Okay.
18 A  Or several doors, I should say.
19 Q  And as it was communicated to you, was that a
20 mandatory requirement?
21 A  It wasn't given to me to implement; I just knew
22 about that general policy for each door.

Page 15

1  Q  Okay.
2  A  I had nothing to do with putting the guards at
3  the door; that was something that I just had a general
4  knowledge of.
5  Q  Okay. And was that three unarmed guards or
6  armed?
7  A  Armed guards are required at the door.
8  Q  Okay, armed?
9  A  Yes, armed.
10 Q  All three had to be armed?
11 A  All three had to be armed.
12 Q  Okay. Was there any other requirement in terms
13 of passing people through metal detectors or anything of
14 that nature?
15 A  All persons entering the building had to go
16 through the metal detector.
17 Q  Okay.
18 A  That was required.
19 Q  Now, was that a standing metal detector?
20 A  Yes, sir.
21 Q  At each entrance?
22 A  Yes.

Page 16

1  Q  Okay.
2     MR. BOUSE: And Mr. Allen, so it's clear --
3     MR. ALLEN: Yes.
4     MR. BOUSE: I think you can ask Mr. Dyer, this
5  occurred after 9/11 --
6     MR. ALLEN: Yes.
7     MR. BOUSE: And it was an everyday operation,
8  not just for events.
9     MR. ALLEN: Right.
10    MR. BOUSE: I want to make sure you understand
11 that.
12    MR. ALLEN: Okay, yes.
13 BY MR. ALLEN:
14 Q  Is that correct, what your counsel just said?
15 A  That is absolutely correct.
16 Q  Okay, all right. Now, just going down to the
17 bottom of the first page again (page 000124), where
18 would the Penn. Ave. Entrance be; would that be the main
19 entrance actually fronting onto Pennsylvania Avenue?
20 A  Yes, sir, what we call the main entrance facing
21 Pennsylvania Avenue, on Pennsylvania Avenue, yes.
22 Q  Okay. And it sounds obvious, but the 12th

Page 17

1  Street/South Plaza, those would be the entrances going
2  out onto 12th Street, I take it?
3  A  It's actually the rear of the building.
4  Q  Oh, the rear of the building.
5  A  Yes, it's actually the rear of the building.
6  Q  Okay.
7  A  South Plaza being the rear; 12th Street, the
8  street that it dumps out into.
9  Q  Okay. And the Roaming Security, can you
10 explain what you meant by that?
11 A  Those are just officers who would not be posted
12 at a door but allowed to roam throughout the event.
13 Q  Okay. Would they be roaming inside the
14 building or outside the building or both?
15 A  No, the outside -- I'm sorry, inside the
16 building.
17 Q  Inside the building?
18 A  Inside the building.
19 Q  Okay.
20 A  But then, again, that -- I'm going to clarify
21 that. Again, I don't give out post-orders.
22 Q  Right.

Page 18

1   A   I simply request and they --'ll say roaming
2   security in terms of we need roaming guards in the
3   building; whether or not they're allowed to go out of
4   the building, I have no idea, I'm not privy to that
5   information.
6   Q   Okay. And did you understand that to be a GSA
7   requirement also, to have roaming security?
8   A   No, it's just that we did that based upon past
9   experience.
10  Q   Okay, all right. And then what is meant by the
11  term, "Load Out," right at the bottom of the page (page
12  00124)?
13  A   We just have to have a guard on the premises
14  after the event is totally over with, and you have
15  several contractors -- such as the caterers and the
16  production crew -- taking down equipment and loading out
17  through the loading dock.
18  Q   Oh, okay, all right. Now, at the top (page
19  00124) you say, "Please review the following security
20  request and make any changes before I forward to DHS.
21  A   Yes, sir.
22  Q   Okay. So was it a requirement, or did you

Page 19

1   understand it to be a requirement, that you had to
2   forward the security plan to DHS?
3   A   Yes, sir. All requests have to go through DHS.
4   Q   Okay.
5   A   They are the ones who provide the guard
6   service.
7   Q   All right. And if you could go to the next
8   page, page 000125 -- or page 2 -- in this packet.
9   A   Yes.
10  Q   Now, the first email was dated March 14 and
11  this email appears to be the following day, March 15.
12  A   Yes, sir.
13  Q   Okay. And, again, it's from you to Linda
14  Jackson.
15  A   That's correct.
16  Q   Okay. Who was Linda Jackson?
17  A   Linda Jackson, from what I understand, is an
18  employee of DHS/FPS.
19  Q   Okay. Had you ever met with Linda Jackson
20  prior to this event?
21  A   No, sir.
22  Q   Okay. How was it that you sent this to her?

Page 20

1   A   She was the person that I was directed to
2   forward the information to, and that person oftentimes
3   changes; it's changed probably four times since her.
4   Q   Okay. And was it forwarded to Linda Jackson
5   for her review and approval?
6   A   It was forwarded to Linda for approval -- the
7   basic approval -- and to actually fulfill the request.
8   In other words, I had to go through her with the request
9   in order for her to fill the request.
10  Q   Okay. And what was it that required you to do
11  that, to go through her; was it part of the contract
12  that Hill Partners had with the government, or why did
13  you do that?
14  A   Because we're required to by GSA.
15  Q   Okay.
16  A   We're required go through DHS to obtain any
17  security for the building.
18  Q   So you did it because GSA told you to,
19  basically?
20  A   Without a doubt, yes.
21  Q   Okay. And would that be a particular
22  individual at GSA who directed you to Linda Jackson?

Page 21

1   A   Again, well --
2   Q   If you can recall.
3   A   The name Vicki Willman comes up because she
4   the person on the frontline in terms of my contact with
5   GSA, and she provides to me information that I need in
6   terms of getting building rentals done.
7   Q   Okay, I understand, all right. And as far as
8   you were concerned at the time when you sent this to
9   her, was it your understanding that you needed her okay
10  before you could go forward, or her approval?
11  A   "Her" being Linda Jackson?
12  Q   Yes.
13  A   You know, I don't think Linda Jackson really
14  looks at it and goes like, well, no you -- in terms of,
15  you know, changing the security requirement, I don--
16  she doesn't do that, she just basically processes the
17  paperwork.
18  Q   Yes.
19  A   She doesn't take it and go, well, I know you
20  guys need more or less security; no, she simply approves
21  the paperwork.
22  Q   Okay. Well, was there anybody in the

**CAPITAL REPORTING COMPANY**

7 (Pages 22 to 25)

Page 22

1  government who did go through that process of reviewing
2  it and saying -- evaluating whether you needed more or
3  less?
4      A  We have -- no, I don't -- there are no persons
5  that we've been made aware of. There was, as you see in
6  my letter, I sent that request -- my first line of
7  management, I sent that request to SecTek so that they,
8  in fact, could provide that change, if necessary, for
9  the event.
10     Q  Okay.
11     A  But we've not been given any particular person
12  that we need to contact and say, hey -- in DHS, that is.
13     Q  Yes.
14     A  You know, would you like to review this and
15  make any changes, if necessary; we've not been given
16  that directive.
17     Q  Okay, all right. You say (page 00125);"Please
18  prepare an RWA for the following scheduled event at The
19  Old Post Office Pavilion."
20     A  Yes.
21     Q  What's an RWA?
22     A  I believe it's a Request for Work

Page 23

1  Authorization.
2      Q  Okay.
3      A  Again, it's a form that we're required to use
4  -- a government form that we're required to use -- and
5  that's something that I made out; it's something that we
6  must provide to DHS in order to obtain security
7  services.
8      Q  Okay. And so when you sent this to Linda
9  Jackson on the 15th of March, did you attach to that
10 email your earlier email to Officer Gross, is that what
11 you did?
12     A  What, did I attach an earlier email?
13     Q  Yes, because it says -- further down, it says
14 -- "Dear Officer Gross" and then it --
15     A  Right, right, oftentimes if it's an email, I
16 will copy it to SecTek or whomever --
17     Q  All right.
18     A  So that they know that the request has been put
19 in to DHS.
20     Q  Okay. I guess what I'm asking is that when you
21 sent your email to Linda Jackson, did it include the
22 information shown on the bottom (page 00125) about the

Page 24

1  security plan?
2      A  Oh, yes -- yes, yes, she has to have that
3  information in order to put together -- to complete the
4  RWA.
5      Q  Okay, all right. When you were putting
6  together the security plan, were there any other
7  entrances or exits that it was anticipated would be used
8  at the event?
9      A  Not, no, what we do is -- the client will ask
10 for a certain number of entrances to be open, that may
11 be at least one; but, based upon the number and the size
12 of the crowd, at least two in this case. But I think it
13 was three in this case, yes.
14     Q  So when you're talking about the client, do you
15 mean, in this case, GW?
16     A  Yes, yes.
17     Q  Okay.
18     A  There were two, Penn. Avenue and South Plaza.
19     Q  So those were the two entrances and exits that
20 you -- based on what GW requested -- thought would be
21 used at the event?
22     A  Correct.

Page 25

1      Q  Okay. I know it's obvious but I need to be
2  pedantic, unfortunately.
3      A  That's fine, that's fine.
4      Q  There are side exits onto 12th Street and onto
5  the 1100 block?
6      A  That is correct.
7      Q  Okay. And when you put this plan together, it
8  looks as though you did not anticipate that those exits
9  would be used, is that correct?
10         MR. BOUSE: Now that has to do with the
11 jurisdictional issue?
12         MR. ALLEN: Well, I think that to the extent
13 that he's forwarding a security request to the U.S., I'm
14 just trying to figure out exactly what the contours of
15 it were, that's all.
16         MR. BOUSE: That's a good try, I admire your
17 effort. No, I'm not going to permit him to answer that
18 at this point. You'll have another opportunity with
19 him.
20         MR. ALLEN: Okay.
21 BY MR. ALLEN:
22     Q  Were there any other communications, apart from

**Capital Reporting Company**

Page 26

1  these emails, between yourself and Officer Gross and/or
2  Linda Jackson; in other words, did somebody give you a
3  call in reference to or in response to these emails. Do
4  you understand the question?
5    A  Right.
6    Q  Yes.
7    A  Well, of course, I would receive additional
8  correspondence from Linda Jackson because she provides
9  the RWA.
10   Q  Right.
11   A  So after the request was put in, she would send
12 an RWA via fax or mail; and we would sign it and send it
13 back to her so that she can request the guard service
14 from -- in this case -- SecTek.
15   Q  Okay, all right. But right now it sounds like
16 you don't recall any phone calls that, say, Officer
17 Gross may have made to you after he got your email?
18   A  No, no. If there is any communication, it
19 would be me calling him and saying, hey, you've seen the
20 email regarding the security request; do you have it in
21 place because the event is coming up. That probably
22 it.

Page 27

1    Q  Do you recall in response to your email where
2  Officer Gross came back with any changes to the plan
3  that you had put together?
4    A  Yeah, as far as I can remember, there was no
5  changes made to the security plan.
6    Q  Okay. Do you recall any queries or questions
7  from Linda Jackson concerning the security?
8    A  No, no.
9    Q  Okay.
10       MR. BOUSE: Let me just refer him to -- this
11 is it?
12       THE WITNESS: Uh-hum.
13       MR. BOUSE: Back to SecTek.
14       MR. ALLEN: Okay.
15       MR. BOUSE: There's a third page, page 000126,
16 Mr. Allen.
17       MR. ALLEN: Yes.
18       MR. BOUSE: Okay.
19       MR. ALLEN: Let's go to that.
20 BY MR. ALLEN:
21   Q  All right. Let's talk about an email; and this
22 is from you to Linda Jackson dated March 22nd, is that

Page 28

1  correct?
2    A  The email, yes, yes.
3    Q  Subject, GW Event, and can you explain what you
4  requested there?
5    A  That's what it says, that SecTek Security is
6  requesting the following hours be added to the work
7  authorization for the event on March 26, basically
8  looking for one supervisor from 9:00 p.m. to 4:00 a.m. I
9  think there was a change of hours on that particular --
10 I think it's the same request but just the change in
11 hours, I believe.
12   Q  Right.
13   A  You see one supervisor. Oh, I think what
14 happened was, I think a supervisor is required on the
15 premises; that's what I believe may have happened on
16 that. My original request did not have a supervisor
17 request.
18   Q  Okay. And who requires a supervisor?
19   A  That would have to come from SecTek.
20   Q  Okay. Do you know whether that was a
21 requirement of GSA as well?
22   A  I really don't know, I don't know about that.

Page 29

1    Q  Okay.
2    A  But under normal operating conditions, there's
3  always a supervisor on duty.
4    Q  Okay, all right. So the final request, then,
5  was as outlined originally but plus one supervisor?
6    A  That's correct, yes.
7    Q  If you could go to the next page, page 000127.
8  Did you ever see this document?
9    A  Yes, this is the RWA or SWA; they keep
10 changing.
11   Q  Okay. And this is essentially whatever its
12 proper title is; this is the authorization for the
13 approval of the security plan, essentially, is that
14 correct?
15   A  That is correct.
16   Q  Okay. And who approved it, do you know?
17   A  Again, this comes from DHS.
18   Q  From DHS?
19   A  Yes, sir. And in this case the signature on it
20 says Loretta -- I'm not sure if it's Loretta Upchurch,
21 and who was the supervisor at the time who did that.
22   Q  Okay.

CAPITAL REPORTING COMPANY

12 (Pages 42 to 45)

Page 42

1  mistreated by a guard, things of that nature, but that
2  would be the extent of it.
3     Q  Okay. But generally, during this timeframe, it
4  sounds like Hill Partners was somewhat out of the loop
5  in terms of providing security for the building, would
6  that be a fair statement?
7     A  Absolutely, 100 percent, we're out of the look,
8  yes.
9     Q  Okay. So I'm wondering if that was the case,
10 how was it that you ended up formulating the security
11 plan for this event?
12    A  Because it was a special event --
13    Q  Okay.
14    A  And it wasn't a normal operating day or event;
15 it's something that we do maybe once -- gosh, we may do
16 it 3-4 times a year.
17    Q  Okay.
18    A  We'll have a special event where we're required
19 to request security for an event, and that was just the
20 normal procedure that we had to go through. We would be
21 required as the property manager to obtain security
22 through GSA.

Page 43

1     Q  Okay. And that would be -- the property
2  manager, is that Linda Freeman?
3     A  The property manager being Hill Partners.
4     Q  Oh, okay.
5     A  The mall property management company had to go
6  through GSA in order to obtain security for special
7  events that they may have.
8     Q  Okay, all right. And that had been the case
9  prior to 9/11 for special events. Hill Partners had
10 always been the entity that organized special events?
11    A  We've always organized special events, yes,
12 sir.
13    Q  Right.
14    A  But we did not always have to go through GSA to
15 hire security; so, in other words, when we had full
16 control over security, we would hire all security staff
17 through whatever contractor we had and use them for
18 special events. It wasn't until 9/11 that we had to go
19 through DHS or GSA to obtain security for special
20 events.
21    Q  Okay. So if I can just try and summarize it to
22 make sure I understood it correctly, Hill Partners was

Page 44

1  responsible for overall security up until 9/11?
2     A  Yes, sir.
3     Q  And then in July --
4        MR. BOUSE: Actually, in July of 2002.
5  BY MR. ALLEN:
6     Q  Yeah, in July 2006, the federal government
7  essentially --
8        MR. BOUSE: July 2002.
9        MR. ALLEN: I'm sorry.
10       MR. BOUSE: July 2002.
11    A  After September 2001 we had a limited amount of
12 security authorization or input at that time.
13    Q  Right.
14    A  And then in July 2002 that was pretty much
15 severed or terminated in terms of our contracts,
16 security contracts.
17    Q  Okay. However, for special events --
18    A  We were still required to request security for
19 those events, and we had to go through DHS.
20    Q  Okay. Who required that; who required you to
21 do that?
22    A  GSA, the landlord.

Page 45

1     Q  Okay.
2     A  We couldn't just go out and hire a security
3  company to come in and provide security for the event;
4  we had to specifically go through GSA and DHS.
5     Q  Okay. And were you required to hire SecTek for
6  special events?
7     A  We were required to hire them if they were the
8  current security company, yes.
9     Q  Okay.
10    A  Like I said, at one time it was AreaWide
11 Security and then it became SecTek.
12    Q  Okay. And the requirement for special events,
13 in terms of entrances, was the same as during the day,
14 three armed guards per entrance?
15    A  For any entrance that is open, yes.
16    Q  Right. And you've had no discretion to alter
17 that, increase it or decrease it?
18    A  No.
19    Q  Okay.
20    A  We had to have at least three.
21    Q  All right. Was there any paperwork generated
22 with the monthly meetings that you described by

Page 38

1  an idea of things that occurred, whether it was a
2  robbery, a stabbing, or a fall, or what have you.
3     Q  Okay. And then after 2001, what change was
4  made?
5     A  Security was taken -- pretty much GSA changed
6  the security and took over that particular operation
7  from the property management company, which I worked
8  for, Hill Partners.
9     Q  Okay. So the reporting, then, went directly to
10 GSA?
11    A  Exactly.
12    Q  Okay. What other, if any, changes were made as
13 far as security arrangements were concerned for The Old
14 Post Office Pavilion after 2001, after 9/11?
15    A  Well, after 2001, it was virtually required by
16 GSA or maybe DHS that all doors be secured with armed
17 guards.
18    Q  Okay. Hitherto, that had not been a
19 requirement?
20    A  That had not been a requirement for the
21 building.
22    Q  Okay. And this three guards per entrance

Page 39

1  requirement, did that come in after 9/11?
2     A  Yes, sir.
3     Q  Okay. What other changes were made, if any?
4     A  I would have to say that pretty much all
5  security operations were changed in terms of where
6  security guard personnel would come from in terms of
7  hiring. Everything that was once done by the property
8  management company, Hill Partners, was pretty much
9  eliminated July 1st of 2002.
10    Q  Okay. Well, prior to 9/11, had the property
11 management company been responsible for hiring the
12 security?
13    A  Yes, sir.
14    Q  Okay. And then so after 9/11 and effective
15 June 2002.
16       MR. BOUSE: July 2002.
17 BY MR. ALLEN:
18    Q  I mean, July 2002, sorry, that responsibility
19 was transferred to GSA?
20    A  Right. That was the ending of our last
21 security contract with Blackhawk Security.
22    Q  Okay. So Hill Partners had hired Blackhawk to

Page 40

1  provide the security for The Old Post Office Pavilion?
2     A  Right, that's correct.
3     Q  And then as of July 2002 --
4     A  They actually terminated those contracts.
5     Q  Right, and then SecTek took over?
6     A  And then SecTek -- they hired SecTek.
7     Q  Okay.
8     A  Actually, it was AreaWide and then SecTek came
9  along and provided security.
10    Q  Okay. And GSA hired SecTek?
11    A  That's correct.
12    Q  Okay. And Hill Partners had no role in hiring
13 SecTek.
14    A  Absolutely no role.
15    Q  Okay, all right. I think we began to talk
16 about Vicki Willman, and I think then we started and
17 kind of went on to other things. If we could just get
18 back to her. You said, I think, that you would meet
19 with her from time to time, is that correct?
20    A  That is correct.
21    Q  Okay. And how often -- in the, again, the
22 early 2005 timeframe, would you meet with Ms. Willman?

Page 41

1     A  At least once a month.
2     Q  Okay.
3     A  There would be some sort of dialogue between
4  us, whether email or face to face.
5     Q  Okay. And what would you discuss in those --
6  either face-to-face meetings or emails?
7     A  Oh, they could be a number of things; they
8  could be anything from the status of various tenants in
9  the building, projects going on in the building, things
10 of that matter, normal operational issues of the
11 building.
12    Q  Okay. Was security discussed?
13    A  Yeah, oftentimes, yeah -- I mean, in 2005?
14    Q  Yes.
15    A  It was only discussed if there was an issue
16 with security. If I had an issue with them or we would
17 be trying to work out something, but nothing in detail
18 in terms of their particular responsibilities or things
19 of that nature -- just general things that were; you
20 know, the issues would come up from time to time when
21 there may be a misunderstanding with what a guard is
22 doing, or there may be a complaint by a tenant being

**Capital Reporting Company**

14 (Pages 50 to 53)

Page 50

1  Officer Gross, I think you told me he was employed by
2  SecTek Security?
3     A  Yes, sir.
4     Q  Was he the chief SecTek officer at The Old Post
5  Office Pavilion?
6     A  I believe Officer Gross was the -- he actually
7  originally started with AreaWide and then, when the
8  contract changed to SecTek, he became an employee of
9  SecTek.
10    Q  Right.
11    A  But I believe he was the building supervisor
12 for SecTek.
13    Q  Okay.
14    A  So he would be the security --
15    Q  In 2005?
16    A  Yes, sir.
17    Q  At the time of the event?
18    A  If I wrote that memo to him or that email to
19 him, yes.
20         (Break at 11:32 a.m.)
21         (Back on record at 11:34 a.m.)
22 BY MR. ALLEN:

Page 51

1     Q  Okay, all right. I think we were talking about
2  Officer Gross, and you said, I thought that at the time
3  -- he had previously been with another company but at
4  the same building; and then, when SecTek took over, he
5  moved to SecTek?
6     A  Yes, sir.
7     Q  And was he the senior SecTek officer?
8     A  I believe so, yes, because he was the person in
9  charge of that site of SecTek.
10    Q  Okay. Is he still there?
11    A  No, sir.
12    Q  Okay. Do you know where is his?
13    A  No. He left several years ago.
14    Q  Okay, all right. Let me just have a look
15 through these documents; I might be pretty much done.
16    A  Okay.
17    Q  I want to just ask you one wrap-up question, if
18 I may?
19    A  Yes, sir.
20    Q  Is there anything about the security plan for
21 this event that you recall that we have not discussed so
22 far this morning?

Page 52

1     A  No, sir, there's nothing that we have not
2  discussed.
3     Q  Okay. And that's it, I'm done.
4     A  Okay.
5        MR. BOUSE: Are you going to ask any
6  questions?
7        MS. BRUCE: Uh-uh, no.
8        MR. BOUSE: No questions?
9        MS. BRUCE: no.
10       MR. BOUSE: Okay. Let me just ask Romberg.
11       MS. BRUCE: He may.
12       MR. ROMBERG: Not at this time.
13       MR. BOUSE: You told me, Tim, they weren't
14 letting you ask questions. I'll let you ask any
15 question you want.
16       MR. ROMBERG: I know, is pitiful.
17       MS. BRUCE: Yeah.
18       MR. BOUSE: Do you want to ask any questions,
19 Tim?
20       MR. ROMBERG: I'm going to reserve at this
21 time.
22       MR. BOUSE: Okay.

Page 53

1        MR. ROMBERG: I'm not ready to go forward.
2        MR. BOUSE: Okay. Let me just ask something
3  because I'm not clear in my own mind. Mr. Dyer, if I
4  may. It's unusual for your own counsel to ask you a
5  question.
6        EXAMINATION BY COUNSEL FOR DEFENDANT, HILL
7  PARTNERS, INC.
8  BY MR. BOUSE:
9     Q  SecTek was brought into the building by GSA?
10    A  Yes, sir.
11    Q  They hired them?
12    A  Yes, sir.
13    Q  Okay. So when you fill out your request for
14 security for an event such as the one we talked about
15 here today, you submitted it to Officer Gross, who was
16 of SecTek?
17    A  Yes, sir.
18    Q  Who was hired by GSA?
19    A  Yes, sir.
20    Q  And has to be approved by SecTek?
21    A  Yes, sir.
22    Q  And he would add or subtract or add to it any

Page 54

1  way he wants?
2      A  Yes, sir.
3      Q  But, basically, SecTek is in that building
4  because they were hired by GSA?
5      A  That is correct.
6      Q  Okay. Thank you.
7          MS. BRUCE: Let me just.
8          MR. BOUSE: You didn't like my question?
9          MS. BRUCE: No. Let me just have one minute.
10         MR. BOUSE: Oh, absolutely.
11         MS. BRUCE: I may want to ask one question
12 just as a follow-up.
13         MR. BOUSE: Sure, absolutely, take as much
14 time as you need.
15             (Off the record at 11:42 a.m.)
16             (Back on record at 11:43 a.m.)
17         (The witness has waived reading and signing.)
18             (Whereupon, at 11:43 a.m., the
19             deposition of RODNEY DYER was
20             concluded.)
21
22

Page 55

1           CERTIFICATE OF NOTARY PUBLIC
2
3      I, JOSEPH KANAHELE, JR., the officer before whom
4  the foregoing deposition was taken, do hereby certify
5  that the testimony that appears in the foregoing pages
6  was recorded by me and thereafter reduced to typewriting
7  under my direction; that said deposition is a true
8  record of the proceedings; that I am neither counsel
9  for, related to, nor employed by any of the parties to
10 the action in which this deposition was taken; and
11 further, that I am not a relative or employee of any
12 counsel or attorney employed by the parties hereto, nor
13 financially or otherwise interested in the outcome of
14 this action.
15
16
17             JOSEPH KANAHELE, JR.
18             Notary Public in and for the
19             District of Columbia
20 My commission expires:
21 October 14, 2011
22