# EXHIBIT 3

1

1       UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3    ---------------------------------:
4    GURPAL SINGH, as Administrator
5    of decedent, RANJIT SINGH,
6                Plaintiffs
7        v.                Civil Action
8    GEORGE WASHINGTON UNIVERSITY,      No. 060574
9    et al.,
10               Defendants
11   ---------------------------------:
12              Washington, D.C.
13              Friday, November 30, 2007
14   Deposition of:
15         PAUL D. CONSTABLE
     called for oral examination by counsel for
16   Plaintiffs, pursuant to notice, at the U.S.
17   Attorney's Office, 501 Third Street, N.W., 4th
18   Floor, Washington, D.C., 20530, before Patricia A.
19   Edwards of Capital Reporting, a Notary Public in
20   and for the District of Columbia, beginning at
21   10:07 a.m., when were present on behalf of the
22   respective parties:

2

1           A P P E A R A N C E S
2
3        On behalf of Plaintiffs:
4           GEOFFREY D. ALLEN, ESQUIRE
5           1730 Rhode Island Avenue, N.W.
6           Suite 206
7           Washington, D.C.  20036
8           (202) 778-1167
9        On behalf of Defendant UNITED STATES:
10          BLANCHE BRUCE, ESQUIRE
11          Assistant U.S. Attorney
12          U.S. Attorney's Office
13          501 Third Street, N.W.
14          4th Floor
15          Washington, D.C.  20530
16          (202) 514-9150
17       On behalf of Defendant DEPARTMENT OFHS ICE:

18          CHRIS GAFFNEY, ESQUIRE
19          Agency Counsel
20          425 I Street, N.W.
21          Washington, D.C.  20001
22          (202) 514-8262


                                3
1          A P P E A R A N C E S (CONT.)
2
3          On behalf of Defendant GEORGE WASHINGTON
4          UNIVERSITY, present by telephone:
5              TIMOTHY W. ROMBERGER, ESQUIRE
6              1025 Connecticut Avenue, N.W.
7              Suite 1000
8              Washington, D.C.  20036
9              (202) 828-1243
10
11         Also Present:
12             Timothy C. Tozer
13
14
15
16
17
18
19
20
21
22


                                4
1              C O N T E N T S
2    EXAMINATION BY:                    PAGE
3      Counsel for Plaintiffs           4,71
4      Counsel for Defendants UNITED STATES     67
5
6    CONSTABLE DEPOSITION EXHIBITS:   *      PAGE
7    1    Old Post Office Pavilion Floor Plan.     8
8
9    (*Exhibits attached to transcript)
10
11
12
13
14
15

16
17
18
19
20
21
22

5

1          P R O C E E D I N G S
2    WHEREUPON,
3              PAUL D. CONSTABLE
4    called as a witness, and having been first
5    duly sworn or affirmed, was examined and
6    testified as follows:
7          EXAMINATION BY COUNSEL FOR PLAINTIFFS
8    BY MR. ALLEN:
9      Q    Good morning.  Could you state your
10   name for the record, please, sir?
11        A    Yes, sir.  My name is Paul Constable.
12        Q    And, Mr. Constable, as you probably
13   know, I'm plaintiff's counsel in this case.
14   I'm here to ask you some questions today,
15   mainly on jurisdictional issues.
16        A    Yes, sir.
17        Q    And if you don't understand any of my
18   questions, you won't hurt my feelings if you
19   ask me to rephrase.  I'll be more than happy
20   to do that.  And if you want to take a break
21   at any time, although this is not going to
22   take long, please let me know.  Of course, we

6

1    will accommodate that.  If you wish to speak
2    with Ms. Bruce at any time during the
3    deposition, the way I'd like to handle that
4    would be that if there's a pending question
5    and you are able to answer the question, you
6    should go ahead and answer the question.  In
7    between questions, if you wish to confer you
8    can do that.  That's fine.
9      A    Okay.
10        Q    What do you do for a living, sir?
11        A    I am the regional director of National
12   Capital Region, Federal Protective Service.
13   It's part of the ICE Integrations and Customs

14  Enforcement, Department of Homeland Security.
15      Q    All right.  And how long have you been
16  in that position?
17      A    In this position since October of this
18  year.
19      Q    And were you acting in that position
20  previously?
21      A    No.  I actually took this position in
22  October.


7

1      Q    Okay.
2      A    Prior to that, I was the deputy.
3      Q    Okay.  All right.  And can you just
4  briefly outline your duties and
5  responsibilities -- I should ask you, how long
6  were you in your previous position?
7      A    Started acting in that position in
8  November 2006 and then I assumed the actual
9  deputy position around August of this year.
10  Again, I moved to the actual regional director
11  in October.
12      Q    Congratulations.
13      A    Thank you, sir.
14      Q    What was your position in March 2005?
15      A    At that time, I was the district
16  commander of the Western District, Federal
17  Protective Service responsible for Northern
18  Virginia.
19      Q    Did you have any responsibilities in
20  the District of Columbia at that time?
21      A    No, sir.
22      Q    All right.  Are you familiar with the


8

1  Old Post Office Pavilion building?
2      A    Yes, sir.
3      Q    And as of -- incidently, all my
4  questions, unless I say otherwise, are going
5  to be directed to the March 2005 time frame.
6  As of that time frame, do you know who owned
7  the Old Post Office Pavilion?
8      A    I knew that the General Service
9  Administration had responsibility of the
10  building.  As to whether -- I have no
11  knowledge of its actual ownership.

12     Q    Are you familiar with the building?
13  Have you been there?
14     A    Yes, sir.
15     Q    How many times have you been there?
16     A    I was there yesterday --
17     Q    Okay.
18     A    -- to re-familiarize myself with it.
19     Q    All right.
20     A    And the last time I was there was
21  around 2002.
22     Q    Prior to that?

                              9
1      A    Prior to the incident.
2      Q    Okay.  All right.  Are you familiar
3   with the area outside the building?
4      A    Yes, sir.
5      Q    Okay.  Why don't we get this marked as
6   deposition Exhibit No. 1.
7           (The document referred to was
8            marked for identification as
9            Constable Deposition Exhibit
10           No. 1.)
11  BY MR. ALLEN:
12     Q    Let me show you what's been marked as
13  deposition Exhibit No. 1.
14     A    Yes, sir.
15     Q    Do you recognize that as a floor plan
16  of the Old Post Office Pavilion?
17     A    It appears -- based on the layout that
18  I've seen, it looks very similar to what I'm
19  familiar with.
20     Q    And I'm looking at it back to front.
21  Let's see.  It appears that this would be the
22  rear of the building and this would be

                             10
1   fronting out onto Pennsylvania Avenue?  Is
2   that the way you would interpret it?  I may be
3   wrong.
4      A    This is 12th Street, according to
5   the --
6      Q    Right.
7      A    I just know that the building has
8   stairs that lead out to Pennsylvania.
9      Q    Right.

10      A   Looking at this, I can't make an
11   actual determination of -- I know this is 12th
12   Street.
13      Q   Uh-huh.
14      A   If this is 12th, I would make the
15   assumption that Pennsylvania is here, but I'm
16   not positive.
17      Q   Okay.  And what about this area here
18   to your right as you're looking at the floor
19   plan?  The other side of the building.
20      A   I'm sorry, sir.  Looking at it, I
21   can't tell.  I know the building, I've been in
22   it.  I know that the Pavilion looks like this,

11

1   but I'm not sure which is the end and which is
2   the front.
3      Q   Okay.  I'm not really asking you that
4   at this point, I'm just asking you if this is
5   12th Street on one side --
6      A   Uh-huh.
7      Q   -- what is on this side, if you know?
8      A   Just coming back to Washington, within
9   the last eight months or so -- I was in
10   Virginia for years.  I've been out of the D.C.
11   area -- I'm not that familiar with the
12   downtown, since I've been away from D.C. for
13   so long.
14      Q   Okay.  When you went to the building
15   yesterday, did you walk around the building?
16      A   I went into the interior of the
17   building.  I didn't walk around the exterior
18   of the building.
19      Q   Okay.  All right.  Now, I don't think
20   I need to enter it as an exhibit, but let me
21   show you a -- what purports to be a
22   declaration of Paul D. Constable.

12

1      A   Yes, sir.
2      Q   Is that a declaration that you made?
3      A   Yes, sir.
4      Q   And it bears your signature at the
5   end?
6      A   Yes, sir.
7      Q   Okay.  Thank you.  In the declaration

8  that you've just identified, you state in
9  paragraph two that in 2003 law enforcement
10  related to security functions for federal
11  agencies were transferred from FPS, which is
12  Federal Protective Services, I imagine -- is
13  that FPS is?
14      A   Yes, sir.
15      Q   GSA to FPS DHS.  Is that correct?
16      A   Yes, sir.
17      Q   Just so that I understand it
18  correctly, the Federal Protective Services
19  really just switched from one government
20  department to another?  From GSA to DHS?  Is
21  that what happened?
22      A   Yes, sir.  We physically switched to

                            13
1  another agency.
2      Q   But the actual FPS itself sort of
3  remained the same?
4      A   The FPS and its responsibilities
5  remained the same.
6      Q   Okay.  And that was pursuant to the
7  Homeland Security Act of 2002; is that
8  correct, sir?
9      A   Yes, sir.
10      Q   Okay.  The -- and you state that the
11  FPS currently derives its authority from Title
12  40 USC Section 1315; is that correct?
13      A   Yes, sir.  The Title 40 1315 was
14  amended to include us.  Prior to that, we had
15  the 318 authority under GSA.  So the authority
16  transferred.
17      Q   Okay.  And so you -- presumably --
18  were you part of that transfer from GSA to
19  DHS?
20      A   I was in the agency when it
21  transferred.  Yes, sir.
22      Q   Now, turning to paragraph three, you

                            14
1  say in or around September 2003, FPS entered
2  into a contract with SecTek, Inc., a private
3  security company?
4      A   Yes, sir.  So from my research, that's
5  what I determined.

6    Q   Okay.  And from what you told me about
7  what you were doing in that time frame, you
8  didn't have any personal involvement in that;
9  correct?
10   A   Correct, sir.
11   Q   How did you come to learn about that
12  arrangement?
13   A   At the time of that statement, I was
14  the deputy and personnel that handled various
15  processes of guard oversight I called into my
16  office and had talks with them, and made
17  determinations on my -- and, also, documents
18  that they were able to show to me.  But,
19  basically, it was a research on my part.
20   Q   Okay.  And they were hired to provide
21  security services to the Old Post Office
22  Pavilion building?

                          15
1    A   Yes, sir.
2    Q   Now, the duties of SecTek you say
3  include, but aren't limited to on-site
4  security and access control?
5    A   Yes, sir.
6    Q   And access control would include
7  entrances and exits, would that be correct?
8    A   The primary purpose of that guard
9  force is to protect the facility and its
10  tenants as to who was coming into that
11  facility.
12   Q   Right.
13   A   So the purpose is to check
14  identification, making sure that they check --
15  like if the check point is the x-ray machine
16  and magometer, making sure there's no
17  suspicious items or weapons coming into the
18  facility.  But the primary purpose is the
19  protect the facility and the tenants.
20   Q   Uh-huh.
21   A   So when you ask me about the entrance
22  and exit, it's really what's coming into that

                          16
1  building.
2    Q   Okay.  As part of your research, I
3  understand it would have focused on the

4    building itself, but did you discover anything
5    about any security arrangements for the areas
6    immediately outside the building?
7        MS. BRUCE:  I'm going to object on the
8    basis of this is outside the jurisdictional
9    discovery, which has been limited by the
10   court.
11       MR. ALLEN:  Well, let me ask a few
12   more questions and I think I'll make it
13   clearer.
14   BY MR. ALLEN:
15    Q    Section 1315 requires the Federal
16   Protective Service to provide security and
17   protection for government property and persons
18   on government property; is that correct?
19    A    Yes, sir.
20    Q    So that if the area immediately
21   outside the Old Post Office building was, in
22   fact, owned or controlled by the U.S., the

                    17
1    U.S. would be required under 1315 to provide
2    security and protection for persons on that
3    property; correct?
4        MS. BRUCE:  Objection.  This is a
5    hypothetical or we're talking about the Old
6    Post Office Pavilion?
7        MR. ALLEN:  No.  It's far from a
8    hypothetical.  This area here.
9        MS. BRUCE:  For the record, can you
10   identify what this area is?
11       MR. ALLEN:  Well, I can tell you what
12   I think it is, but --
13   BY MR. ALLEN:
14    Q    Assuming this is Pennsylvania Avenue
15   and this is 12th Street, this is a --
16   basically a pedestrian walkway between two
17   buildings?  It's not a street?
18       MS. BRUCE:  Stop for a minute.  Off
19   the record.
20       (Off the record.)
21   BY MR. ALLEN:
22    Q    To back track a little bit here,

                    18
1    assuming that this is Pennsylvania Avenue, the

2    area I'm pointing at is right here, and this
3    is, in fact, 12th Street,  as is indicated on
4    the diagram, then the area that I'm
5    referencing in particular is the other side of
6    the Old Post Office Pavilion.  And I believe
7    that it is -- it's not a street, it is a
8    bricked area, which appears to be a -- they
9    describe it as a pedestrian concourse between
10   two buildings.  And I believe -- although I
11   don't know for sure, which is why I asked you
12   -- that it, in fact, is U.S. property.  But I
13   don't know that for a fact.
14       A   I have no knowledge of that, sir.  I
15   just know that Federal Protective Service is
16   responsible for providing security and law
17   enforcement for GSA owned and leased
18   facilities.
19       Q   Okay.  And that would -- if, in fact,
20   I was correct and this area is owned by the
21   U.S., that would include that area; correct?
22       A    When you say U.S., sir, there's a lot

                            19
1    of property that's owned by U.S. that we do
2    not necessarily have jurisdiction over.
3        Q   Uh-huh.
4        A    Again, it has to be GSA owned or at
5    least property.  Or a nexus to that property.
6        Q   Okay.  All right.  So if it was GSA
7    owned, then you would be -- your agency would
8    be responsible for its protection?
9        A    An example would be the White House.
10   We have no jurisdiction -- it's federal
11   property, but we have no direct jurisdiction
12   over that.
13       Q   Okay.  No.  I understand.  And if you
14   could just educate perhaps a little bit in
15   this area.  Are most government departments,
16   in fact, owned by GSA?
17       A   I would say a large number of them are
18   or they have control of the property, but not
19   necessarily.
20       Q   Okay.
21       A    Some have delegation or have their own
22   -- do their own property management.

20

1   Q   Okay.  All right.  Very good.  Thank
2   you.  And returning to paragraph three of your
3   declaration, you say that the duties and
4   responsibilities of SecTek include
5   surveillance, protection, and inspection of
6   all internal and perimeter areas; correct?
7       A   May I see my statement?
8       Q   Sure.  Absolutely.
9       A   My statement is based on my general
10  knowledge of my research of my contracting
11  guard service.
12      Q   Uh-huh.
13      A   When I say interior and perimeter,
14  definitely the interior,  but the perimeter
15  would be maybe like a loading area where it
16  would make deliveries, but it does not imply
17  that it would be anything further than that.
18      Q   Okay.  Would it include steps leading
19  from the doorway down to street level?
20      A   If the property was actually GSA
21  property, then we would be responsible for
22  security protection of GSA property.  I can't

21

1   make an assumption like that.  I have no idea
2   if the stairs are GSA or not.
3       Q   All right.  And then C is patrolling
4   the building.  And would that include
5   patrolling the perimeter of the building?
6       A   In this case here, when I looked at
7   the exhibits, the contract exhibits, there was
8   a roving guard.
9       Q   Uh-huh.
10      A   That roving guard was -- the primary
11  purpose was the interior of that building.
12      Q   Was there any mention of the outside
13  of the building?
14      A   The guards do not have the authority
15  to carry their weapons outside that building.
16      Q   Okay.
17      A   They can only stay on the actual GSA
18  property.  They cannot go out into the city of
19  D.C. and carry a gun.
20      Q   Okay.  All right.  But they can stand
21  on the steps of the building leading down to

22   street level presumably?

                                    22
1      A    Again, they can stand on GSA property.
2   I just don't want to make any assumptions here
3   of what's property and what's not property.
4      Q    Okay.  Turning to paragraph four, you
5   say pursuant to the contract between FPS and
6   SecTek, SecTek is expected to comply with
7   various regulations and standards in
8   performing its work and meeting its
9   obligations under the contract.  Again, do you
10  want to take a look?
11     A    I'm okay with that.
12     Q    Oh, you're okay with that.  What are
13  those regulations and standards?
14     A    Well, when I made that statement, I'm
15  referring to the guard program manual.
16  There's an actual manual of operation.
17     Q    Right.
18     A    The guards have post orders that
19  define their responsibilities.  The company
20  has an obligation to comply with the contract,
21  the actual contract.  Sometimes the contracts
22  have modifications because of issues, so when

                                    23
1   I make that general statement, I'm referring
2   to post op orders, a guard program manual,
3   those type of things that define their
4   responsibilities and how they're supposed to
5   operate.
6      Q    Okay.  So it's the guard program
7   manual and the contract, principally?
8      A    And post orders.
9      Q    And post orders?
10     A    Every post has post orders that they
11  have to comply with.
12     Q    And is it your understanding that
13  every entrance and exit would be a duty post?
14     A    Not necessarily, sir, it's all
15  dependent on the agency.  They may have some
16  entrances that are shut down.  There may be
17  five entrances to the building, but they're
18  only going to bring the people through one
19  entrance or two entrances.  So I can't make a

20   statement like that.
21      Q    Okay.  I think my question was a
22   little imprecise, actually.  I should have

                                    24
1   said any operating entrances or exits.
2      A   If a determination was made to put
3   guards there.  For instance, I'll give you an
4   example.  Some entrances may have card readers
5   with no guards.
6      Q   Right.
7      A   This particular facility I can't make
8   a statement as to what was there and what
9   wasn't there, I just -- I read the post
10   exhibits, I just know that there were guards
11   there.  They conduct an x-ray and magometer at
12   certain check points.  And there was a roving
13   guard, but to answer your question there could
14   be entrances that had no guards.
15      Q   Right.
16      A   Because they're electronically
17   controlled.
18      Q   Right.  No.  I understand that.
19      A   Or key controlled.
20      Q   Uh-huh.  So I guess I need to hone my
21   question down still further here.  For any
22   entrances or exits that were in use, that

                                    25
1   weren't electronically controlled, would there
2   have to be a duty post there?
3      A   Not necessarily.  Based on
4   determinations -- every building has to have
5   requirements to determine -- I can't give you
6   an answer to that, sir.  I don't know if I
7   understand your question.
8      Q   All right.  Let me see if I can refine
9   it a little bit.  I think I can.  Any entrance
10   or exit where there was public access, which
11   wasn't electronically controlled, would that
12   have to be a duty post at such an entrance or
13   exit?
14      A   Hypothetical for any building or this
15   building?
16      Q   Well, let's say this building.
17      A   I can't answer that question directly,

18   because there are buildings that do not have
19   guards.  There are federal buildings that are
20   open to the public, where the public can
21   actually walk through -- or there are areas of
22   the building.  Some areas are public, like

26

1   maybe they have shopping or events, so I
2   cannot provide an answer to that question,
3   because it's too broad of a question to give
4   an answer to.
5       Q    The type of building that you're
6   referring to would be a mixed use building?
7   Is that what you're referring to when you say
8   --
9       A    When I looked at this building
10  yesterday, this is a mixed use building.
11      Q    And that means that there are some
12  areas where there's some retail and there's
13  also areas that are office space; is that
14  correct?
15      A    But your question is more broader than
16  that, because it's also based on time, it's
17  based on the threat and risk level at that
18  time.  Prior to 9-11, a lot of federal
19  buildings were more open to the public without
20  guards, so -- I wasn't there at that time, so
21  I can't provide you an answer.  Because your
22  question is whether there are guards to be

27

1   posted at every entrance and exit and I have
2   no answer for that, because I was not there.
3       Q    Okay.  Well, again, I'm focusing in on
4   the March 2005 time frame.
5       A    Yes, sir.
6       Q    That's the time frame I'm really
7   interested in.  And is it correct that after
8   9-11, security arrangements for federal
9   buildings were tight?
10      A    Generally, yes, sir.
11      Q    Okay.  And in what ways?
12      A    Depending on what was in that
13  building.  Agencies that had higher threat
14  risks, such as FBI, Department of Defense,
15  they would have required higher protection.

16   Other buildings that were more open to the
17   public, like libraries, education, may not
18   have had increased security.  Not to the same
19   level.
20      Q    Okay.  You weren't there, of course,
21   but two days ago I took the deposition of
22   Rodney Dyer, who worked for Hill Partners,

                                            28
1   Inc., which was the property management
2   company at the time, and still is, I believe,
3   for the Old Post Office Pavilion.  And he
4   indicated that it was his understanding that
5   for any entrance/exit to the building, to the
6   Old Post Office Pavilion, the requirement was
7   that three armed guards had to be present.
8        MS. BRUCE:  I'm going to object.  He
9   can't testify --
10        MR. ALLEN:  No.  I'm just going to ask
11   him whether he's familiar with such a
12   requirement, that's all.
13         THE WITNESS:  I have no -- I was
14   directly responsible for that building.
15   Everything I've talked about in that document
16   is based on my research -- the items that I
17   researched.  Items that I researched.  I have
18   no specific answer to that question.
19   BY MR. ALLEN:
20      Q    So you can't state whether there was
21   or was not such a requirement in effect in
22   March 2005 for the Old Post Office Pavilion?

                                            29
1      A    What is such a requirement?
2      Q    The three armed guards per entrance --
3   operating entrance/exit.
4      A    I can make one statement to this.
5      Q    Okay.
6      A    There was a recommendation -- prior to
7   2005, I was the chief of security for the
8   National Capital Region and all the GSA
9   property fell under my control for security
10   and we had made recommendations that if you
11   have a security check point with an x-ray and
12   magometer, that it would be good to have three
13   personnel, one to operate the x-ray machine,

14   one to operate the magometer, one to check
15   ID's.
16       Q    What is a magometer?
17       A    It's a device that a human-being walks
18   through and detects whether you have handguns
19   or metallic weapons.
20       Q    A metal detector, in other words?
21       A    It was a recommendation to the agency,
22   so when you ask that question, I can't say


                                    30
1    that that particular location -- it was just a
2    recommendation.  It wasn't an absolute
3    requirement, because these decisions are based
4    on the threat and risk of that facility, the
5    ability of those agencies to be able to pay
6    for those type of assets.   It's an economic
7    decision.  So there is no -- it's basically up
8    to that agency as to what they can afford to
9    pay for or what they're willing to do.  They
10   can deviate from that.
11       Q    So if you have a Treasury Building,
12   let's say, then the actual decision would be a
13   Treasury Department decision?
14          MS. BRUCE:  I'm going to object.  This
15   is way outside jurisdiction --
16          MR. ALLEN:  No, it isn't.
17          MS. BRUCE:  Yes, it is.
18          MR. ALLEN:  Not at all.
19          MS. BRUCE:  Then I would ask that you
20   direct the questions to the building and the
21   time frame, as opposed to hypothetical
22   buildings.


                                    31
1          MR. ALLEN:  Right.  I'm not going to
2    get into a big argument.
3    BY MR. ALLEN:
4        Q    I think I understand your answers.  I
5    think we can move on.  You say while -- and,
6    again, I'm in paragraph four.  I don't know if
7    you want to take a look at it.  While FPS at
8    times conducts quality assurance inspections,
9    training oversight and post audits to ensure
10   that SecTek is meeting its obligations under
11    the contract and compliance with post orders,

12 FPS does not manage or supervise the daily
13 operations of SecTek.  That's what you say in
14 your declaration?
15     A   Yes, sir.
16     Q   Okay.  Can you tell me what -- and,
17 again, during the relevant time frame -- what
18 quality assurance inspections were being
19 conducted by FPS at the Old Post Office
20 Pavilion?
21     A   I can't give you a direct answer for
22 that location, but I know, generally, quality

                              32
1 assurance means that at our discretion and at
2 our determination of when.  They can be spot
3 checks or random checks, which is what they
4 normally are.  We check to make sure that the
5 guards have weapons, that they're armed
6 property, they have their handcuffs, they're
7 dressed properly.  So when you say quality
8 assurance, it's making sure that they're
9 complying with the contract and representing
10 their responsibilities appropriately and
11 professionally.
12     Q   Okay.  And do you have any idea how
13 often those were done at this building?
14     A   Not at that building, but generally it
15 could be once a month or, if the guard
16 contract is having problems, it could be
17 weekly.  It's at our discretion.  I only have
18 about 107 law enforcement personnel that
19 handle over 700 facilities in D.C., Virginia,
20 and Maryland, so it's based on my resources,
21 understanding that we also have to provide a
22 police response and conduct viability

                              33
1 assessments.  So I have a limited number of
2 assets.  There is not day to day monitoring of
3 these guard forces.
4     Q   Are reports made when such an
5 inspection is done?
6     A   If we have findings.  We write up the
7 report and we may do deductions on the
8 contract for certain violations that they've
9 made.

10     Q   So that would be like a violation
11   report then?
12     A   It's like an efficiency report.  If we
13   find that -- let's say it's an armed post and
14   they're not carrying a gun, they were replaced
15   by somebody else that's not carrying a gun, we
16   can write it up.  But the determination of the
17   deduction is actually with the contracting
18   officer, which now is in Philadelphia.
19     Q   Okay.  So if there was a deficiency,
20   then something would be knocked off the amount
21   they were paid, is that what you're saying?
22     A   Possibly.


                              34
1     Q   Okay.
2     A   That's a determination made by the
3   contract.  We just report the finding and we
4   make the recommendation that goes to the
5   contracting officer and they make the
6   decision.
7     Q   Okay.  All right.  And are those
8   deficiency reports maintained or kept?
9     A   Yes, sir.
10     Q   So for 2005 would they still be in
11   existence now?
12     A   They should be in existence, but we
13   have to understand, too, that a lot of changes
14   have been made since our transfer to Homeland
15   Security.  Initially, the contracting was
16   handled by GSA and in 2003 it was transferred
17   to FPS and was actually in my facility.  When
18   I say my facility, it was in our region.  At
19   that time I was in Virginia and now it's in --
20   it's centralized in Philadelphia, so all the
21   records and things have been -- over the last
22   so many months have been transferred to


                              35
1   Philadelphia.
2     Q   But as far as you know, those records
3   for 2005 would be either in Philadelphia or on
4   their way to Philadelphia?
5     A   If there was a reason to retain them.
6   If they're still being retained, that's the
7   question.

8     Q   Yes.  Okay.  All right.  You say that
9   FPS also conducts training oversight, what's
10   meant by that?
11     A   When the guard company qualifies with
12   their weapons, we observe it.  We make sure
13   that the scoring is done properly, that the
14   range is run properly.  That if somebody is
15   supposed to shoot, we check the ID to make
16   sure that that particular person is the
17   shooter.  It's an oversight.  Again, it's
18   based on our ability to provide somebody at
19   that range on that day.
20     Q   So is it done in all cases or just
21   when you've got the staff available?
22     A   I would say we generally try to do --

36

1   especially on a range qualification, we try to
2   do that one all the time, because that one's a
3   very risky operation.  Any time you've got
4   somebody carrying a weapon, we like to make
5   sure that we're there.  But the actual company
6   that's responsible for the actual training,
7   actual conduct of it, we just do oversight of
8   it.  We just observe.
9     Q   And, again, if you noticed any
10   deficiencies or problems, is there any kind of
11   report generated?
12     A   There could be.  Or something could be
13   notified to the company.  There could be.
14     Q   Is there a particular name for such a
15   report?
16     A   It could be something as simple as a
17   phone call, it could be an e-mail.  They could
18   have done a -- there's a format that's used
19   and I believe it's a 28.  But usually on
20   shooting ranges, most of that is --
21     Q   Form 28 is what you said?
22     A   I believe it's a 2028 form, but it's a

37

1   deficiency form.
2     Q   Okay.
3     A   They might use that, but usually on
4   range qualification, if they identify a
5   problem, it's corrected on the spot.

6   Q   Okay.

7   A   That's just one example of training

8 that we do.

9   Q   Are there any other examples?

10   A   We can pop in on all their training.

11 They do CPR training and those types of

12 things.  And, again, we're a quality assurance

13 oversight, not the day to day management of

14 it.  The company actually manages themselves.

15 They have their own supervisors, they're

16 charged with their own management, own

17 supervision.  Again, we're just strictly an

18 oversight.  It's at our discretion what we

19 want to observe.  We may pop in on any of

20 their training.

21   Q   So you told me about firearms training

22 and CPR training.  Anything else come to mind?

38

1   A   Well, there's other training that we

2 also assist in.  We provide training in x-ray

3 machine and magometers at one of our

4 facilities.  We actually have the guards come

5 to our location and we conduct that training.

6   Q   And that's training on the hardware

7 for entrances and exits?

8   A   Because we supply the equipment.

9   Q   Okay.

10   A   Because we supply the equipment, we

11 take a more direct responsibility with that to

12 make sure they know how to operate it.

13   Q   Okay.  So FPS supplies the magometer?

14   A   We pay for it.  When I say pay for it

15 -- if the agency that's in that -- what we

16 call the tenant agency, if they decided they

17 want x-ray mag, they actually fund it.  It

18 goes through us and we make determinations on

19 how it's laid out, we make recommendations on

20 the type of equipment, but the actual tenant

21 agency pays for it and it basically goes

22 through us for its security services.

39

1   Q   Okay.  All right.  So firearms, CPR,

2 training on the hardware, such as magometers

3 and x-ray machines?

4    A    Uh-huh.
5    Q    Anything else?
6    A    Really any training they would do, but
7 off the top of my head, that's the only thing
8 that I can think of at this time.
9    Q    Okay.  When the -- when a security
10 company, such as SecTek, is about to hire a
11 guard, is there any paperwork that has to be
12 submitted by the company to FPS on that
13 individual?
14    A    We conduct suitability checks.
15 Background checks and make those kind of
16 determinations.  We look at their criminal
17 records and whether they have a criminal
18 record or not.
19    Q    So you do a criminal record check?
20    A    We do a background check.
21    Q    Anything else?  What would the
22 background check involve, apart from a

                            40
1    criminal record check?
2    A    Pretty much a criminal record check.
3    We look at the state -- they'll fill out the
4    paperwork, we'll look at all that.
5    Q    Uh-huh.
6    A    But we also -- as part of that
7    suitability is what we call certification
8    training.
9    Q    Uh-huh.
10    A    Again, we verify that they've
11    completed all their training, that they have
12    qualified with a weapon and we provide a card
13    that they carry that is what we call a
14    certification card.
15    Q    Uh-huh.
16    A    It has an expiration date and, again,
17    it's a verification by us that they've
18    completed certain levels of training that were
19    required for that contract.
20    Q    Okay.  Now, if a particular guard --
21    you say they get a card and it has an -- like
22    a driver's license, kind of.  What happens

                            41
1    once it expires?

2    A   The company -- it's up to the company
3  to make sure they meet those requirements.
4  Again, we're just oversight.  The company is
5  responsible for doing the range shooting, the
6  CPR, meeting all the requirements.  We just
7  like to make sure they've done those things
8  and it leads to a certification.  But, again,
9  it's not day to day management of that
10  operation.
11    Q   No.  No.  I understand that.  But I'm
12  just saying if a particular guard's
13  certification has run out, does that mean that
14  he can't continue to work on one of your
15  properties?
16    A   Not necessarily.  Let's say that the
17  weapon qualification expired --
18    Q   Uh-huh.
19    A   -- they may be able to be at a post
20  that doesn't require a weapon.  It's all based
21  on the requirements for that particular post.
22    Q   But if it was a -- if they wanted to

                         42
1  use him on an armed post, he's have to have a
2  -- he or she would have to have a current
3  firearms certification; is that correct?
4    A   They have to meet requirements for
5  that post.
6    Q   Right.  And would that be one of the
7  things that you'd be checking when you made
8  your quality assurance check?  That all the
9  certifications are up to date?
10    A   Well, not me.
11    Q   I understand.
12    A   There are people below me that do
13  these type of checks.
14    Q   Okay.  And then in terms of compliance
15  with post orders, is that -- would that be
16  done on the on-site inspections, to make sure
17  that they're doing what the post orders say?
18    A   Yes, sir.
19    Q   And then if they weren't, that would
20  be a deficiency report?
21    A   It may be, yes.  We may do something
22  as simple -- my personnel may do something as

43

1   simple as walk up to the guard and say why
2   don't you have your hat?
3       Q   Oh.
4       A   So they may do on the spot correction.
5       Q   Right.
6       A   They'll bring it to the supervisor --
7   the company has supervisors.  They may bring
8   it to the supervisor's attention and say the
9   guard's not -- may not actually write it up,
10  but just make the on the spot correction.
11      Q   So that would involve the inspector
12  having the post orders for each duty post;
13  correct?
14      A   Each post has to have their orders
15  present at that post or available to them.
16      Q   And he or she would check what was
17  actually being done against what the post
18  orders required?
19      A   They can do that.  It's up to the
20  discretion of the inspector what he or she
21  wants to look at.  He may not actually look at
22  the post orders, but he or she, depending gone

44

1   what they found in the past or -- it's like
2   anything in life.  If the guard company's
3   doing a good job, then we don't want to go in
4   there and constantly, you know --
5       Q   Nit-pick?
6       A   Correct.  Because we have moral issues
7   that we have to maintain.  We don't want to
8   demoralize them or affect the moral
9   unnecessarily.
10      Q   Okay.  Okay.  I'm going to move on to
11  paragraph five.
12      A   Yes, sir.
13      Q   Do you want to take a look at it?
14      A   If you just tell me what the issue is,
15  I'll --
16      Q   All right.  You say with regard to the
17  Bhangra Blowout, so it's mainly dealing with
18  the Bhangra -- and you know what the Bhangra
19  blowout event -- and you say that the event
20  took place outside the Old Post Office
21  Pavilion's normal hours of operation; correct?

22     A    From my read of the report, the event

45

1   was in the late hours, somewhere between like
2   2300 hours to 2:00 or 3:00 in the morning.  It
3   was outside the normal federal government's
4   operating hours is what I'm saying.
5       Q    Yes.  Okay.  And then you say the
6   contract between the General Services
7   Administration and the George Washington
8   University to rent the Old Post Office
9   Pavilion for this event was not coordinated
10  with FPS prior to -- or at any time -- during
11  the event?
12      A    Correct.
13      Q    Do you know whether FPS even knew that
14  the event was going to occur?
15      A    From my research in talking with
16  personnel that were around, I couldn't find
17  anybody that knew about it.
18      Q    Okay.
19      A    From my understanding, my region had
20  no knowledge of that event until after the
21  incident happened.
22      Q    Okay.  And the following sentence,

46

1   actually, seems to make that clear.  You say
2   FPS was no involved in any decisions related
3   to security and/or law enforcement needs for
4   this event?
5       A    Correct, sir.
6       Q    Nor did FPS provide any security
7   personnel or services for this event; is that
8   correct?
9       A    From a police officer or other --
10  there was no FPS personnel involved in that
11  matter.
12      Q    No FPS security guards?
13      A    No FPS federal police officers or
14  federal employees from the Federal Protective
15  Service.
16      Q    Okay.  And then you say it's my
17  understanding that George Washington
18  University, the GWU South Asian Society, and
19  the on-site property manager, Hill, Inc.,

20   independently arranged security for the event
21   with Falcon Security Corporation and SecTek,
22   Inc.?

                                47
1        A    From my research, that's what I
2   determined.
3        Q    Okay.  And that FPS was basically out
4   of that loop entirely?
5        A    From what I understand, we didn't
6   learn about it until MPD, the Metropolitan
7   Police Department Communications Center,
8   notified us that they had an incident.  And,
9   really, they had the crime scene and all
10  already secure by the time that we knew
11  anything about this incident.
12       Q    Okay.  I'm going to move on to
13  paragraph six.  And, again, if you want to
14  look at it --
15       A    I'm fine, sir.
16       Q    Even if FPS had been involved with
17  providing security for the March 26th/27th
18  Bhangra Blowout event, I am not aware of any
19  statutes, regulations, directives, or policy
20  related to a requirement to post guards at the
21  exit for special events at the Old Post Office
22  Pavilion.  Now, I'd like to ask you whether or

                                48
1   not 1315, which we discussed earlier --
2   doesn't 1315 apply 24 hours a day?
3        A    Apply to who, sir?
4        Q    To federally controlled buildings?  In
5   other words, the responsibility of FPS to
6   provide protection to federal buildings is not
7   a 9:00 to 5:00 responsibility, it's a 24-hour
8   a day responsibility, isn't it?
9        A    Yes, sir.
10       Q    And then you say these types of
11  decisions are left to the discretion of local
12  officials within FPS, based upon an evaluation
13  of a number of factors, including, but not
14  limited to, the nature of the event, the
15  availability of personnel and financial
16  resources, and other related considerations
17  under the circumstances.  And my question is

18    that FPS, under Section 1315, does not have a
19    discretion to provide no security, does it?
20        A    That's a tough question, sir.  I'm not
21    sure if I understand it.
22        Q    Okay.  If you've got a -- if you've

                                            49
1    got -- we'll let's take the Old Post Office
2    Pavilion as a more specific example.  I
3    understand in determining precise security
4    levels, that may be determined by officials
5    based on a number of the factors that you've
6    outlined?
7        A    Certain characteristics and
8    requirements.
9        Q    Right.  The nature of the building,
10    the use of the building, and so on, and so
11    forth?
12        A    Yes, sir.
13        Q    But there is no discretion to fail to
14    provide any security under 1315; correct?
15        A    I still don't understand this
16    question.
17        Q    All right.  If you've got -- 1315
18    requires FPS to provide protection for federal
19    buildings and people in federal buildings or
20    on federal property; correct?
21        A    Right.
22        Q    And in order to comply with that

                                            50
1    statute, some security has to be provided;
2    correct?
3        A    When you say security, I'm not clear
4    whether you mean guards, or cameras, or a
5    lock, or a key lock.  There are actually some
6    federal facilities that are like a heating and
7    power plant, which is GSA controlled, and the
8    only security that we have to provide there is
9    to make sure that it's locked and nobody --
10    it's got a fence, but there are no guards
11    there.
12        Q    No.  I'm not saying --
13        A    That's why I'm having trouble with
14    your question.
15        Q    Okay.

16    A  Your question is very complex to
17  answer.
18    Q  Okay.  Well, there's no discretion to
19  -- let's give you a very specific example.
20  There is no discretion, under 1315, to have
21  exits -- entrance and exits completely
22  unmonitored at a time when large numbers of

51

1  people are using that exit; correct?
2    A  I can't answer that question.  I have
3  no -- it's too complex.  These are based on
4  decisions of a security specialist.  Normally,
5  our job is to protect federal facilities and
6  its tenants, and protect it from threats or
7  risks coming into the facility.  Once it exits
8  the federal property, if I understand what
9  you're asking, they're now exiting onto city
10  property.
11    Q  Well, not necessarily.
12    A  Okay.  So -- but our job is to protect
13  that facility and its tenants during normal --
14  during government operations.  So when you
15  start talking about an exit, it's not clear to
16  me what you're asking, because if you're
17  relating to the situation, the D.C. government
18  and its police department protects its streets
19  and its public areas.  Once somebody leaves a
20  federal property, it's not in our jurisdiction
21  any longer.
22    Q  No.  I understand that.  But the --

52

1  and I'm not trying to argue with you.
2    A  I just want to make sure that -- this
3  is a very complex issue that you're asking and
4  I'm not sure what direction you're going with
5  this.
6    Q  Okay.  Well, the duty to provide
7  protection to persons on the property extends
8  to more than just tenants though, doesn't it,
9  under 1315?
10    A  Our job is the responsibility -- the
11  1315 gives us our authority, but our duties
12  are defined as protecting GSA owned and leased
13  property and its tenants.  Yes, if there's a

14    credit union in there, they, in essence, you
15    know -- they may not be receiving direct
16    protection, but they're inside the facility
17    and by the fact that we protect what comes
18    into the building, they receive some of that
19    protection, basically.
20        Q    Uh-huh.
21        A    But our sole responsibility and what
22    we're paid for -- we're actually financed and

                                          53
 1    paid for are by the -- our operations are
 2    funded by federal agencies.  If it wasn't for
 3    federal agencies, Federal Protective Services
 4    would not exist.  Our salaries and everything
 5    are based on those -- what puts us in a
 6    building or gives us that responsibility is
 7    what they paid for.  So when you ask me about
 8    exit, it's a very difficult question, because
 9    my concern is what gets into that building and
10    puts that building and those tenants at risk.
11        Q    Okay.  Well, let me see if I can make
12    it a bit more specific and see if that might
13    sort of assist.
14        A    Okay.
15        Q    I understand that about 1,200 people
16    attended this particular event, the Bhangra
17    Blowout.  And let's just assume that that's
18    roughly correct.
19        A    So I can assume that I wasn't there
20    and I have no knowledge of this?
21        Q    Okay.  All right.  Those 1,200 people
22    were on or in a federal building; correct?

                                          54
 1        MS. BRUCE:  I'm going to object now,
 2    Jeffrey.  I've given you enough leeway.  This
 3    is way outside the jurisdictional issue, which
 4    we're supposed to be here about, which is
 5    whether there is a mandatory policy regarding
 6    the placement of security guards at the exits
 7    of the Old Post Office Pavilion and whether
 8    DHS or FPS exercised supervision over SecTek's
 9    day to day operation.  I think the record's
10    clear, I gave you leeway, but now you've gone
11    way outside jurisdiction.  I'm going to

12  object.
13       MR. ALLEN:  Okay.  I understand your
14  objection, but I disagree with it entirely,
15  because what we're talking about here is the
16  extent of Section 1315, which is a mandatory
17  requirement.  And I can -- it's hard for me to
18  imagine anything more relevant to that issue
19  than what we're talking about right now, to be
20  honest.  But I take it you're not instructing
21  him not to answer?
22       MS. BRUCE:  I think in light of the

                              55
1   court's order, yes, I am.
2        MR. ALLEN:  Well, then -- I don't
3   think -- I think that's noncompliance with the
4   federal rules.  I think the federal rules
5   require you to note an objection and allow the
6   witness to answer.  They do not permit you to
7   instruct a witness to not answer.  I mean the
8   rules are very clear on it.
9        MS. BRUCE:  May I have a minute,
10  please?  The rules -- the rules are clear and
11  I also have before me the court's order, which
12  states accordingly, the court will deny the
13  United States' motion to dismiss without
14  prejudice and allow plaintiffs to conduct
15  discovery limited to the following issues.
16  One, whether there's a mandatory policy
17  regarding the placement of security guards at
18  the exits of the Old Post Office Pavilion;
19  okay?
20       MR. ALLEN:  Uh-huh.
21       MS. BRUCE:  The questions -- I've
22  allowed you some leeway, so that it's on the

                              56
1   record, but at some point we're going to the
2   substance of what happened that evening, which
3   is outside the court's order.  Question number
4   two, whether GSA exercised supervision over
5   Hill Partners day to day operation at the Old
6   Post Office Pavilion, and number three,
7   whether DHS or FPS exercised supervision over
8   SecTek's day to day operation at the Old Post
9   Office Pavilion.

10          MR. ALLEN:  Right.
11          MS. BRUCE:  The questions that you've
12    asked for the last five minutes are outside.
13    I've allowed some leeway, but at some point --
14    I'm objecting now.
15          MR. ALLEN:  You agree that 1315 is a
16    mandatory requirement; correct?
17          MS. BRUCE:  I'm not testifying and I'm
18    not going to agree to anything.
19          MR. ALLEN:  Well, it says shall
20    provide security.
21          MS. BRUCE:  Like I said, I'm not going
22    to testify -- I'm not here to testify.


                                           57
1          MR. ALLEN:  The question is very
2    simple.  Does 1315 apply to the people who
3    attended this event?  Now, how you can, you
4    know, claim that that's beyond the scope of
5    discovery on this issue is hard for me to
6    understand, to be honest.
7          MS. BRUCE:  I don't -- maybe if you
8    could explain more -- what it has to do with
9    the questions which we have to answer.
10          MR. ALLEN:  Okay.  Well, my contention
11    -- the plaintiff's contention is that Section
12    1315 is a mandatory requirement.  It uses the
13    term shall, it doesn't use the term may.  It
14    says shall.  Shall normally means that you've
15    got to do it.  And, therefore, it's mandatory.
16    You know, that part of it, I think is not very
17    controversial.  Now, all I'm asking the
18    witness is whether that mandatory requirement
19    to provide protective services would apply to
20    the people who actually attended this event?
21          MS. BRUCE:  And I think he answered
22    that, which is the reason why I'm objecting,


                                           58
1    which is it depends on the circumstances of
2    the building and the events.  He's answered
3    that.
4          MR. ALLEN:  Well, let me ask him again
5    and let's get the answer again, and then we
6    can be clear.
7          MS. BRUCE:  Maybe if you limited that

8  down to question number one, two, and three --
9       MR. ALLEN:  It's definitely one, the
10  mandatory requirement.  Okay.
11       MS. BRUCE:  Well -- well --
12  BY MR. ALLEN:
13       Q    And you've probably forgotten and so
14  have I exactly what I asked you and exactly
15  what your response is, so let's do it again.
16       A    Okay.
17       Q    Does Section 1315, which, as I
18  understand it, requires the federal government
19  -- or Federal Protective Services to provide
20  protection to persons on government property?
21  Would that apply to the people who attended
22  the Bhangra Blowout party on March 26th/27th

59

1  2005?  Would that section apply to those
2  people?
3       A    Our security and protection
4  determinations are based on our discussions
5  with the agencies that are in those
6  facilities.  And in working with them,
7  requirements and determinations are made as to
8  what needs to be placed at that building to
9  protect those federal tenants.  If
10  determination is made to put guards with x-ray
11  machines and mags, we're looking for devices
12  and weapons entering that building.  So even
13  though the primary purpose is for those
14  federal tenants, the fact that we stop weapons
15  and devices from entering the building,
16  anybody else that's in that building, such as
17  commercial entities or events like this, are
18  basically gaining from that protection.
19       But the intent of the protection is to
20  protect the federal tenants that are in that
21  federal facility.  If those -- that could be a
22  federal building and if the federal tenants

60

1  decided that it was a public access and
2  decided not to put guards there, they can
3  actually decide not to put guards there and it
4  could be a public access.  The Reagan
5  Building, prior to 9-11, anybody could walk

 6  through the building, there was no guards.
 7  The agencies that were in the building, had
 8  their own guards, but the actual, what we
 9  call, the base building, during certain hours
10  anybody could walk in there and -- park and
11  walk through the buildings.  So -- so your
12  question is quite complex and I can't give you
13  like a specific answer that you're trying to
14  read from me right now.  It's all dependent on
15  those agencies and what determinations are
16  made on what needs to be protected and how to
17  protect it.
18        All we do is make recommendations.
19  And I do have police officers to provide
20  patrol and response, but basically for three
21  states and over 700 federal facilities.  So I
22  can't give you the answer that you're seeking

                        61
 1  from me, because it's too -- it's a very
 2  complex question, there's not a simple answer
 3  to that.
 4     Q    Okay.  Can you break it down to make
 5  it more simple?
 6     A    You would have to break down the
 7  question so I can give you the answer.  I'm
 8  not going to just throw out answers at you.
 9     Q    Okay.  Well, in this particular case,
10  you indicated that there could be
11  circumstances where you're basically
12  protecting the tenants and anybody else who
13  was on the property with the kind of
14  incidental beneficiary of that protection.
15  That was the first part of your answer.  At
16  the Bhangra Blowout, the building was -- all
17  the tenants weren't there.  I mean, you know,
18  it was --
19        MS. BRUCE:  I'm going to object,
20  because now -- I mean we're assuming facts not
21  in evidence.  He doesn't know who was there
22  that evening.  He said he wasn't there.

                        62
 1        MR. ALLEN:  Oh, come on.  8:00 in the
 2  evening until 2:00 in the morning.  We know
 3  who was there.

4        MS. BRUCE:  Well, we're not testifying
5    that because we don't know who's there.
6        MR. ALLEN:  We do know who was there.
7    We know 1,200 people were attending the
8    Bhangra Blowout.  We know exactly who was
9    there.
10        MS. BRUCE:  He wasn't there.  He
11    wouldn't know who was there or how many people
12    was there.
13        MR. ALLEN:  I'm not asking if he knew
14    personally who was there, but I mean there is
15    no real issue as to who was in the building
16    during the hours of 8:00 in the evening until
17    2:00 in the morning.  We know who was in the
18    building.
19        MS. BRUCE:  But that's -- it's
20    assuming facts that he wouldn't know about.
21    Facts that --
22        MR. ALLEN:  He doesn't need to know

63
1    about them.  He doesn't need to have personal
2    knowledge.  I mean he's got --
3        MS. BRUCE:  I think this may be a good
4    time to take a break.
5        (Off the record.)
6        MR. ALLEN:  We were talking about -- I
7    think my question was at this particular event
8    took place after hours and, therefore, there
9    wouldn't have been tenants in the building or
10    it's very unlikely that there would have been
11    tenants in the building at the time.  I think
12    at that point you objected; is that right?
13        MS. BRUCE:  Right.  Because he
14    wouldn't know what tenants were in the
15    building or, you know, what the hours you're
16    talking about.
17        MR. ALLEN:  Uh-huh.  But I can
18    simplify the question.
19    BY MR. ALLEN:
20        Q    If you had a situation where there
21    weren't any tenants in the building at the
22    time, would 1315 apply to the people -- to

64
1    invitees who were attending an event, such as

2  the Bhangra Blowout party?

3       MS. BRUCE:  And I'm going to object

4  again -- object again, because, once again,

5  that has nothing to do with the mandatory

6  policy regarding the placement of security

7  guards at the exits of the Old Post Office

8  Pavilion or number three, his supervision over

9  SecTek's day to day operation.

10      MR. ALLEN:  It certainly has a lot to

11  do with the mandatory requirement to provide

12  security at the building and the question as

13  to who the duty to provide security applies

14  to.

15      MS. BRUCE:  Once again, I'll object.

16  It doesn't have anything to do with it.

17      MR. ALLEN:  Well, I'm asking the

18  question and -- are you instructing him not to

19  answer?

20      MS. BRUCE:  I'll instruct him not to

21  answer.

22      MR. ALLEN:  Okay.  Well, we may have

65

1  to do this again, then, because that is the

2  critical question.  If you're instructing him

3  not to answer it -- I mean you are aware of

4  the rule which requires you to launch an

5  objection and allow the witness to answer;

6  correct?

7       MS. BRUCE:  I'm aware of the fact that

8  there's a court order, which is the reason why

9  we're here, for discovery purposes.  And the

10  court instructed the parties to limit

11  discovery to three areas, based upon the

12  court's order.  That is the reason why I'm

13  objecting to that question.

14      MR. ALLEN:  And that's the basis for

15  your instructing him not to answer?

16      MS. BRUCE:  Based upon the court's

17  order, absolutely.

18      MR. ALLEN:  Okay.  All right.

19  BY MR. ALLEN:

20   Q   To your knowledge -- and, again, this

21  is referenced to this particular event on the

22  date that it occurred -- did GSA have any

66

1   security responsibilities for the building?
2        MS. BRUCE:  I'm going to object.  Only
3   if he has personal knowledge to that question.
4        MR. ALLEN:  Okay.
5        MS. BRUCE:  He can answer it, only if
6   you have personal knowledge.
7        THE WITNESS:  I have no idea how to
8   answer that question.  I don't know.
9   BY MR. ALLEN:
10    Q    Okay.  Do you know who -- again,
11   personal knowledge -- do you know a person at
12   GSA by the name of Linda Jackson?
13    A    I may have heard the name before, but
14   I don't recall the actual individual.
15    Q    Do you have any idea what her duties
16   and responsibilities were at the time of this
17   event?
18    A    I don't recall anything, sir.
19    Q    At the time of this event, was there
20   -- with regard to security issues, was there
21   any kind of inter-departmental contact between
22   GSA and FPS with regard to security issues?

67

1    A    The Federal Protective Service is the
2   security for GSA.  So there are discussions
3   that go on between GSA and FPS.
4    Q    What type of discussions?
5    A    I don't understand your question.
6    Q    Well, you said there are discussions
7   that occur with respect to to security issues
8   between GSA and FPS.  With regard to the Old
9   Post Office Pavilion, can you give me any idea
10   of what those contacts and discussions might
11   be?
12    A    I just said that there would be that
13   type of communication, but I'm not clear what
14   you're asking.  I can't provide you an answer.
15    Q    Okay.  Okay.  Just a second.  Let me
16   go through a few documents and you may be just
17   about done.  Just a few more questions and
18   then we will be done.  You know, we started
19   off talking about the -- what's been marked as
20   deposition Exhibit No. 1 and I asked you
21   certain questions about the perimeter and who

22 owned the land adjacent to the building, and

68

1 you indicated that you didn't know?

2  A Right.

3  Q If I wanted to find out, who would you

4 suggest I ask?

5  A I don't know, sir.

6   MR. ALLEN:  I think that's it.  Thank

7 you.

8   EXAMINATION BY COUNSEL FOR

9    DEFENDANT, UNITED STATES

10 BY MS. BRUCE:

11  Q Just a couple of quick questions.  In

12 regards to your declaration, on paragraph

13 four, you were asked or you read when FPS at

14 times conducts quality assurance inspection,

15 training oversight, and post audits to ensure

16 that SecTek, Inc. is meeting its obligations

17 under the contract and compliance with the

18 post orders.  Then it continues.  FPS does not

19 manage or supervise the daily operations of

20 SecTek, Inc. guards or personnel at the Old

21 Post Office Pavilion, nor is FPS involved in

22 any day to day decisions related to SecTek's

69

1 performance under the contract.  Would you

2 explain what you meant when you wrote in that

3 declaration FPS does not manage or supervise

4 the daily operations of SecTek?

5  A We do not supervise the guard force.

6 We do not manage them.  Basically, we have

7 outsourced the security with a private

8 company, a company that goes into the facility

9 and provides the protection meeting the

10 requirements that we established, but they do

11 not work directly for us.  We do not supervise

12 them.  If decisions have to be made about

13 whether a guard needs to be -- let's say calls

14 out sick or those type of things, we have no

15 supervisory or direct management

16 responsibility over that company.  They do not

17 work for us.

18  Q And the next sentence indicates these

19 duties and responsibilities are handled by

20   supervisors and other personnel employed by
21   SecTek.  Would you explain that sentence
22   further, which is in paragraph four of the

70

1   declaration?
2      A    The company has its own supervisors
3   and managers that actually -- the guards
4   directly report to.  I do not have supervisors
5   at that location, nor do I have police
6   officers at that location on a regular basis,
7   so, basically, those guards are reporting to
8   company supervisors and managers that actually
9   manage them.
10      Q    And the final sentence in paragraph
11   four reads, moreover, FPS does not have any
12   personnel on site at the Old Post Office
13   Pavilion.  Explain that sentence which you
14   wrote?
15      A    We do not have a police substation
16   there, we do not have any police officers
17   there.  The only thing that we would do for
18   that facility would be, like any facility, we
19   have patrol and incident response authority
20   over that location.  But there is no
21   permanently placed police officers there or
22   any type of station for them to operate from.

71

1      Q    And when you were asked earlier about
2   quality assurance inspections, training
3   oversight, and post audits, what is the FPS
4   role, once again?
5      A    It is strictly quality assurance and
6   oversight, like conducting inspections.
7      Q    And, sir, are you familiar with
8   whether there is a mandatory policy regarding
9   the placement of security guards at the exits
10   of the Old Post Office Pavilion?
11      A    I know of no policy or regulation that
12   requires the placement of security guards at
13   exits.
14      Q    And, sir, do you know whether DHS or
15   FPS exercise supervision over SecTek's day to
16   day operations at the Old Post Office
17   Pavilion?

18      A   Can you repeat that question?
19      Q   Whether DHS or FPS exercise
20   supervision over SecTek's day to day
21   operations at the Old Post Office Pavilion?
22      A   We do not do day to day supervision of

72

1   SecTek.
2      Q   And do you have any knowledge whether
3   GSA exercised supervision over Hill Partners
4   day to day operations at the Old Post Office
5   Pavilion?
6      A   I have no knowledge or understand of
7   that question.  I have no answer for that.
8          MS. BRUCE:  I believe that's all the
9   questions I have.
10         MR. ALLEN:  I have just a few follow-
11   up questions in light of those questions.
12         FURTHER EXAMINATION BY COUNSEL
13             FOR PLAINTIFFS
14   BY MR. ALLEN:
15      Q   You said that FPS does not exercise
16   day to day control over SecTek's operations at
17   the Old Post Office Pavilion; okay?  And my
18   question is with respect to day to day
19   operations by SecTek in March 2005, do you
20   have any personal knowledge of the level of
21   supervision exercised by FPS?  Personal
22   knowledge.

73

1      A   I have no personal knowledge of the
2   operations in Washington, D.C.  At the time, I
3   was in charge of Northern Virginia.
4          MR. ALLEN:  Okay.  Thank you.  I have
5   no further questions.
6          MR. ROMBERGER:  I just want to restate
7   my objection that I stated during Ms.
8   Willmann's deposition that we object to not
9   being allowed to participate in the
10   questioning and that's really all I have.
11         (Whereupon, in the presence of
12   respective counsel, the witness does not waive
13   reading and signing of the deposition.)
14         (Whereupon, at 11:28 a.m., the taking
15   of the deposition was concluded.)

16
17
18
19
20
21
22

74

1        CERTIFICATE OF NOTARY PUBLIC
2
3        I, PATRICIA A. EDWARDS, the officer before whom the
4    foregoing deposition was taken, do hereby certify that
5    the witness whose testimony appears in the foregoing
6    deposition was duly sworn by me; that the testimony of
7    said witness was taken by me in stenotype and thereafter
8    reduced to typewriting under my direction; that said
9    deposition is a true record of the testimony given by
10    said witness; that I am neither counsel for, related to,
11    nor employed by and of the parties to the action in
12    which this deposition was taken; and, further, that I am
13    not a relative or employee of any counsel or attorney
14    employed by the parties hereto, nor financially or
15    otherwise interested in the outcome of this action.
16
17
18              PATRICIA A. EDWARDS
19          Notary Public in and for the
20              District of Columbia
21    My commission expires:
22    January 1, 2010

75

1        A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3    I, PAUL D. CONSTABLE, do hereby acknowledge I have read
4    and examined the foregoing pages of testimony, and the
5    same is a true, correct and complete transcription of
6    the testimony given by me, and any changes or
7    corrections, if any, appear in the attached errata sheet
8    signed by me.
9
10
11
12
13

```
14
15
16
17
18
19
20
21  _____        _____
22  Date                   PAUL D. CONSTABLE
```

76

```
 1  Blanche Bruce, Esq.
 2  Assistant U.S. Attorney
 3  U.S. Attorney's Office
 4  501 Third Street, N.W., 4th Floor
 5  Washington, D.C.  20530
 6        IN RE:  GURPAL SINGH, as Administrator of
 7   decedent RANJIT SINGH
 8  Dear Ms. Bruce:
 9   Enclosed please find  your copy of the deposition of
10  PAUL D. CONSTABLE,  along with the original signature
11   page.  As agreed, you will be responsible for contacting
12   the witness regarding signature.
13     Within 30 days of receipt, please forward errata
14  sheet and original signed signature page to counsel for
15  Plaintiffs, Geoffrey D. Allen, and Defendants, Timothy
16  W. Romberger and Chris Gaffney.
17     If you have any questions, please do not hesitate to
18  call.  Thank you.
19  Yours,

20  PATRICIA A. EDWARDS
    Reporter/Notary
21  cc:  Geoffrey D. Allen, Esq., Timothy W. Romberger, Esq.
22       Chris Gaffney, Esq.
```

77

```
 1  Capital Reporting Company
 2  1821 Jefferson Place, N.W.
 3  3rd Floor
 4  Washington, D.C.  20036
 5  (202) 857-3376
 6         E R R A T A  S H E E T
 7  Case Name:  GURPAL SINGH, as Administrator of decedent
 8         RANJIT SINGH
 9  Witness Name:  PAUL D. CONSTABLE
```

10  Deposition Date:  November 30, 2007
11  Page No.   Line No.         Change/Reason for Change
12
13
14
15
16
17
18
19
20
21  _____        _____
22  Signature                        Date